WALTER BRASHEAR, APPELLANT V. FRANCIS WEST, THOMAS M. WILLING AND HENRY NIXON, EXECUTORS OF JOHN NIXON DECEASED, AND HENRY NIXON, SAMUEL MIFFLIN AND JOHN LAPSELEY, ASSIGNEES OF FRANCIS WEST, APPELLEES.

FRANCIS WEST, HENRY NIXON, SURVIVING EXECUTOR OF JOHN NIXON DECEASED, AND HENRY NIXON, SAMUEL MIFFLIN AND JOHN LAPSELEY, ASSIGNEES OF FRANCIS WEST, APPELLANTS V. WALTER BRASHEAR, APPELLEE.

It is not necessary to the validity of a deed of assignment for the benefit of creditors, that creditors should be consulted; though the propriety of pursuing such a course will generally suggest it, when they can be conveniently assembled. But be this as it may, it cannot be necessary that the fact should appear on the face of the deed.

That a general assignment of all a man's property is *per se* fraudulent, has never been alleged in this country. The right to make it results from the absolute ownership which every man claims over that which is his own.

An assignment was made by Francis West, to certain trustees of all his property, giving a preference to particular creditors; who were to be paid their claims in full, before any portion of the property assigned was to be divided among his other creditors. By the court : the preference given in this deed to favoured creditors, though liable to abuse, and perhaps to serious objections, is the exercise of a power resulting from the ownership of property which the law has not yet restrained. It cannot be treated as a fraud.

The assignment excluded from the benefit of its provisions, all creditors who should not within ninety days, execute a release of all claims and demands on the assignor of any nature or kind whatsoever. By the court: This stipulation cannot operate to the exemption of any portion of a debtor's property, from the payment of his debts. If a surplus should remain after their extinguishment, that would be rightfully his. Should the fund not be adequate, no part of it is relinquished. The creditor releases his claim only to the future labours of his debtor. If this release were voluntary; it would be unexceptionable. But it is induced by the necessity arising from the certainty of being postponed to all those creditors who shall accept the terms, by giving the release. It is not therefore voluntary. Humanity and policy both plead so strongly in favour of leaving the product of his future labours to the debtor, who has surrendered all his property, that in every commercial country known to the court, except our own, the principle is established by law. This certainly furnishes a very imposing argument against its being denied. The objection is certainly powerful, that it tends to delay creditors. If there be a surplus, the surplus is placed in some degree out of the reach of those who do

[Brashear v. West and others.]

not sign the release, and thereby entitle themselves under the deed. But the property is not entirely locked up. - A court of equity, exercising chancery jurisdiction, will compel the execution of the trust, and decree what may remain to those creditors who have not acceded to the deed. Yet the court are far from being satisfied, that upon general principle, such a deed ought to be sustained.

Whatever may be the intrinsic weight of objections to such assignments, they seem not to have prevailed in Pennsylvania. The construction which the courts of that state have put on the Pennsylvania statute of frauds, must be received in the courts of the United States.

The assignment transferred to the assignees a debt due to the assignor by the complainant. The complainant filed a bill against the assignees, claiming to set off against the debt assigned to them, the amount of a judgment obtained by him against the assignor, after the assignment. By the court: if subsequent to the assignment being made, and before notice of it, any counter claims be acquired by a debtor to the assignor, these claims may, unquestionably, be sustained. But if they be acquired after notice, equity will not sustain them. If it were even true that they might have been offered in evidence in a suit at law brought in the name of the assignor, he who neglected to avail himself of that advantage, cannot, after judgment, avail himself of such discount as plaintiff in equity.

To deprive a party of the fruits of a judgment at law, it must be against conscience that he should enjoy them. The party complaining, must show that he has more equity than the party in whose favour the law has decided.

Construction of the laws of Pennsylvania relative to foreign attachments.


APPEALS from the circuit court of the United States for the district of Kentucky.

These cases were argued by Mr Bibb for the appellant, Walter Brashear; and by Mr Sergeant and Mr Peters, for the appellees.

Mr Chief Justice MARSHALL delivered the opinion of the Court.

These are appeals from a decree pronounced in the court of the United States for the seventh circuit and district of Kentucky, on a bill filed by Walter Brashear, on which an injunction was awarded to stay proceedings on two judgments obtained against him in that court, by Francis West. The final decree perpetuated the injunction as to the sum of four thousand and eleven dollars and sixty-eight cents, the supposed

[Brashear v. West and others.]

amount of a judgment obtained against the complainant as special bail for West, and dismissed the bill as to the residue, with ten per cent damages thereon. Both parties have appealed to this court.

Francis Brashear, the plaintiff, a resident of Kentucky, being in Philadelphia, executed two notes on the 28th of February 1807, to Francis West, a citizen of Philadelphia, for three thousand five hundred and twenty-seven dollars and eighty-two cents each, payable fifteen months after date. On the 13th of July 1808, he executed a paper writing, in Kentucky, acknowledging the balance of an account due from himself to West, amounting to two thousand one hundred and forty-seven dollars and seventy-six cents.

The two notes, executed in February 1807, were assigned soon after their date to John Nixon of Philadelphia, as collateral security for a debt due from West to him.

On the 21st of April 1807, West assigned all his estate to trustees to be sold, and the money paid, first to certain preferred creditors, and afterwards to his creditors generally; with a proviso that no creditor should be entitled to receive any dividend who should not, within ninety days from the date of the deed, execute a release of all claims and demands upon the said Francis West, of any nature or sort whatsoever.

The plaintiff was also indebted to James Latimer of Philadelphia, to whom he consigned a quantity of ginseng with instructions to pay the proceeds, after discharging his own debt, to certain other creditors of the consignor, pro rata.

On the 10th of December 1808, James Latimer, to prevent other creditors, as he alleges, from obtaining a prior lien on the property in his hands, sued out a foreign attachment against the effects of Brashear, summoning himself as garnishee, and requiring bail in the sum of eight thousand dollars. He gave immediate notice of this proceeding to Brashear.

Early in the year 1809, he took a large part of the ginseng to himself, as purchaser, at six months credit; which he shipped on his own account to China, in March of that year. In the following May he shipped the residue, on account of himself and William Redwood.

On the 11th of March 1809, Francis West sued out a foreign attachment to the use of his assignees, against Brashear, and

summoned Latimer as garnishee. The process was executed the 7th of April.

On the 23d of September 1809, an attachment was sued out by Nixon's executors, which was returned executed on the 9th of October.

The attachments sued out in the name of West, by his assignees, and by Nixon's executors, were prosecuted to judgment.

In August 1811, James Latimer became insolvent, and assigned all his property for the benefit of his creditors. His debt to Brashear amounted to four thousand nine hundred and eighty-five dollars and thirty-five cents; no part of which could be collected, his whole estate being absorbed by preferred creditors.

Suits were instituted, in the name of Francis West, on the notes assigned to John Nixon, and on the acknowledged account herein before mentioned, in the circuit court of the United States for the district of Kentucky, and judgments obtained thereon. A bill was filed by Walter Brashear to be relieved from these judgments.

The bill alleges that the assignment to Nixon, and also that to Mifflin and others, trustees for general creditors, are fraudulent and void. · It also alleges, that in September 1808, the plaintiff had become special bail for the said Francis in a suit instituted against him in one of the courts of Kentucky, by a certain George Anderson, in which judgment was obtained against him, and afterwards against the plaintiff as his special bail, for the sum of four thousand and eleven dollars and sixty-eight cents. That on the 3d day of November 1808, the said Francis West received for the plaintiff one hundred and twenty dollars, from the commissioner of loans in the city of Philadelphia, on account of the claim of William Bush ; to which the plaintiff was entitled. And that the said Francis West was responsible for the money lost by the plaintiff in the hands of James Latimer; that loss having been caused by the attachments sued out to attach his effects in the hands of the said Latimer, and by the negligent and illegal manner in which the said attachments were prosecuted.

The answers admit that the assignment to Nixon was made for the purpose of securing a debt due to him, amounting to

rather more than two thousand dollars. They insist that the assignment to Mifflin and others, for the benefit of the creditors of West, was fair and legal ; and that Brashear had notice of it before he became special bail for West at the suit of Anderson.

They contend that the attachments were legal, and were conducted regularly, and without fraud.

James Latimer, who was sworn as a witness, deposes that he shipped part of the ginseng on his own account, before the attachments were laid by the assignees of West; and that he shipped the residue after the attachment sued out by Mifflin and others, trustees for the creditors, had been served. He says there was not any collusion, agreement or consent between the executors of Mr Nixon, or the assignees of Mr West and himself, that the property or money attached should remain in his hands, should be shipped abroad, or used or disposed of in any way; other than the consent of the assignees of Mr West, that the ginseng might be sold ; which consent was after their attachment, and before that of Mr Nixon's executors; nor was there any consent on the part of the said assignees or executors to any delay or procrastination of payment on his part.

The court admitted and allowed the claim to a set off for the money paid by the plaintiff as special bail for West, at the suit of Anderson, but rejected the other claims.

It is admitted that Nixon's executors have no interest in the notes assigned to their testator, beyond the debt intended to be secured; and to that extent their claim cannot be controverted. The suggestions made in the bills against it, are unsupported ; and are denied in the answer.

The first inquiry is into the validity of the general assignment to Mifflin and others, trustees for the creditors of West.

This instrument conveys to Samuel Mifflin, John Lapseley and Henry Nixon, all his estate, real, personal and mixed, in trust to sell the same as soon as conveniently may be, and to collect all debts due to the said West, and to pay and discharge the debts due from him, first to certain preferred creditors, and afterwards to creditors generally ; " provided, nevertheless, that none of the above described creditors shall be entitled to receive any part or dividend of the property hereby conveyed, or its proceeds, who shall not, within ninety days from the date

[Brashear v. West and others.]

hereof, sign and execute a full and complete release of all claims and demands upon the said Francis West, of any nature or sort whatsoever."

This deed was executed on the 21st day of April 1807, was acknowledged before the mayor of the city of Philadelphia on the 22d, and was recorded in the proper office of the city and county on the 27th of the same month. Its validity appears never to have been questioned in the state of Pennsylvania.

The objections made to it in argument are,

1. That the creditors were not consulted.

2. That they do not appear to have assented to the deed.

3. That possession was not delivered.

4. That the assignment is in general terms.

5. That it excludes all creditors who shall not, within ninety days, execute a release of all claims and demands on the said Francis West, of any nature or sort whatsoever.

1. It is not necessary to the validity of a deed of assignment that creditors should be consulted, though the propriety of pursuing such a course will generally suggest it, where they can be conveniently assembled. But be this at it may, it cannot be necessary that the fact should appear on the face of the deed. Had it been material, it ought to have been suggested in the bill. The fact would then have been put in issue, and might have been proved.

2. The same answer may be given to the second objection. The bill does not allege the refusal of the creditors to assent to the deed of assignment. That fact is not put in issue. The acceptance of the trust by the trustees, and the acquiescence of the creditors for more than twenty years, afford presumptive evidence in favour of their assent: and that is sufficient, in a case in which it is not made a subject of direct inquiry by the pleadings.

3. The real estate passed by delivery of the deed. The claims on Brashear were not objects of delivery. They could be assigned only in equity ; and notice, when given, consummated the assignment. The question of delivery is not made in the proceedings. It is not alleged that West retained possession of any part of the property conveyed in the deed. Fraud may be given in evidence, but is not to be presumed.

4. It is also objected that the assignment is in general terms, and that no schedule of the property is annexed.

That a general assignment of all a man's property is, per se, fraudulent, has never been alleged in this country. The right to make it results from that absolute ownership which every man claims over that which is his own. That it is a circumstance entitled to consideration, and in many cases to weighty consideration; is not to be controverted. If a man were to convey his whole estate, and afterwards to contract debts, there would be much reason to suspect a secret trust for his own benefit. The transaction would be closely inspected, and a sweeping conveyance of his whole property would undoubtedly form an important item in the testimony to establish fraud. So, in many other cases which might be adduced. But a conveyance of all his property for the payment of his debts, is not of this description. It is not of itself calculated to excite suspicion. Creditors have an equitable claim on all the property of their debtor; and it is his duty, as well as his right, to devote the whole of it to the satisfaction of their claims. The exercise of this right by the honest performance of this duty cannot be deemed a fraud. If transferring every part of his property, separately, to individual creditors in payment of their several debts, would be not only fair but laudable; it cannot be fraudulent to transfer the whole to trustees for the benefit of all.

In England such an assignment could not be supported, because it is by law an act of bankruptcy, and the law takes possession of a bankrupt's estate and disposes of it. But, in the United States, where no bankrupt law exists for setting aside a deed honestly made for transferring the whole of a debtor's estate, for the payment of his debts; the preference given in this deed to favoured creditors, though liable to abuse, and perhaps to serious objections, is the exercise of a power resulting from the ownership of property, which the law has not yet restrained. It cannot be treated as a fraud.

5. The fifth and most serious objection is, that the deed excludes all creditors who shall not within ninety days execute a release of all claims and demands on the said Francis West, of any nature or kind whatsoever.

[Brashear v. West and others.]

The stipulation cannot operate to the exemption of any portion of a debtor's property from the payment of his debts. If a surplus should remain after their extinguishment, that would be rightfully his. Should the fund not be adequate, no part of it is relinquished. The creditor releases his claim only to the future labours of his debtor. If this release were voluntary, it would be unexceptionable. But it is induced by the necessity arising from the certainty of being postponed to all those creditors who shall accept the terms by giving the release. It is not therefore voluntary. Humanity and policy however both plead so strongly in favour of leaving the product of his future labour to the debtor, who has surrendered all his property, that, in every commercial country known to us, except our own, the principle is established by law. This certainly furnishes a very imposing argument against its being deemed fraudulent.

The objection is certainly powerful, that its tendency is to delay creditors. If there be a surplus, this surplus is placed, in some degree, out of the reach of those who do not sign the release, and thereby entitle themselves under the deed. The weight of this argument is felt. But the property is not entirely locked up. A court of equity, or courts exercising chancery jurisdiction, will compel the execution of the trust; and decree what may remain to those creditors who have not acceded to the deed. Yet we are far from being satisfied that, upon general principles, such a deed ought to be sustained.

But whatever may be the intrinsic weight of this objection, it seems not to have prevailed in Pennsylvania. The construction which the courts of that state have put on the Pennsylvania statute of frauds must be received in the courts of the United States.

In Lippincott and Annesly v. Barker, 2 Binney, 174, this question arose, and was decided, after elaborate argument, in favour of the validity of the deed. This decision was made in 1809; and has, we understand, been considered ever since as settled law.

In Pierpoint and Lord v. Graham, 4 Wash. Rep. 232, the same question was made, and was decided by Judge Washington in favour of the validity of the deed. This decision was

made in 1816. We are informed of no contrary decision in the state of Pennsylvania, and must consider it as the settled construction of their statute. The validity of the deed cannot now be controverted, no actual fraud being imputed to it.

2. The assignment of the debt due from Brashear to West being valid in equity, has Brashear a right to set off, in equity, against judgments obtained for the use of the assignees in the name of West, his claims against West for the money paid to Anderson, and for the money received on Bush's claim?

The question, whether he might have availed himself of these offsets at law, does not now arise. Can he avail himself of them as plaintiff in equity?

That a chose in action is assignable in equity, is not controverted. Equity will protect and enforce the assignment. If subsequent to its being made, and, before notice of it, any counter claims be acquired by the debtor, these claims may unquestionably be sustained. But if they be acquired after notice, equity will not sustain them. If it were even true that they might have been offered in evidence in a suit at law brought in the name of the assignor, he who has neglected to avail himself of that advantage, cannot, after the judgment, avail himself of such discounts as plaintiff in equity. To deprive a party of the fruits of a judgment at law, it must be against conscience that he should enjoy them. The party complaining must show that he has more equity than the party in whose favour the law has decided. This cannot be done in a case like the present, unless the equity of the debtor accrued before notice of the assignment. The right to these discounts then depends on the fact of notice.

The assignment was made on the 21st of April 1807. In September 1808, Brashear became special bail for West in a suit instituted by George Anderson. The bill alleges that at the time of becoming special bail, Brashear had no notice of the assignment. The answer avers that he had notice.

It is contended in argument, that the fact of notice is not sufficiently proved by the answer. This cannot be admitted. The defendant has a judgment at law, and the plaintiff comes into court to set aside that judgment by his superior equity. He must show that equity.

A circumstance appears in evidence which has some ten-

[Brashear v. West and others.]

dency to support the answer. In July 1808, the account was settled between Brashear and West, and the balance acknowledged. This account calculates interest up to the 21st of April 1808, the day on which the assignment was made; and strikes the balance on that day. The coincidence countenances the belief that the calculation of interest stopped on that day, because the account was then transferred; and increases the probability that West, who acknowledged the account, was informed of the reason.

We think then that Frashear, having had notice of the assignment when he became special bail for West, cannot be permitted to set off the money paid on that account against the judgment, unless he was induced to trust West by the conduct of the assignees. Of this we find no evidence in the record.

The money received by West for Bush's claim is a still later transaction, and is consequently subject to the same rule.

5. The last point to be considered is the claim of Brashear to compensation for the loss of the money attached in the hands of Latimer.

The bill charges that this money would have been paid by Latimer, had he not been restrained by the attachments; that those suits were wilfully or negligently procrastinated by the plaintiffs, whose duty it was to have brought them to a conclusion, and to have obtained the money which ought to have been adjudged to them, before Latimer became insolvent; and farther, that the effects attached ought to have been secured by measures which the law authorized, but which were totally omitted.

The answers deny these charges, and aver that the suits were prosecuted with diligence, and every step taken to secure the debts which the law prescribed.

The first impression would be that the creditors who sued out their attachments were desirous of obtaining their money, and would not intentionally interpose obstacles to the accomplishment of their object. It may also be stated with some confidence, that those who sue out process authorized by law, are not responsible for the loss consequent from that process, unless that loss is produced by the improper use made of it. The charges made in the bill and denied in the answers, must be

[Brashear v. West and others.]

supported by evidence, or the plaintiff cannot prevail. He relies on the proceedings in the attachment as furnishing this evidence.

The writ sued out by the assignees of Francis West, in his name, was returnable to June term 1809. The defendant not appearing, judgment was rendered against him at the third term; on the 20th of January 1810; which was as soon as by the course of the court it was attainable. No further step appears to have been taken in this cause. The court is not satisfied that, had a scire facias been sued out against the garnishee, judgment could have been obtained before he became insolvent.

Nixon's executors sued out their attachment in October 1809, and obtained judgment at the third term by default. A writ of inquiry of damages was awarded in March and executed in June term 1811; and final judgment rendered for eight thousand three hundred and twenty-eight dollars and thirty cents, the damages assessed by the jury. A scire facias was immediately sued out against Latimer, the garnishee, returnable to September court. In the preceding August, Latimer became insolvent.

The only delay with which Nixon's executors can be chargeable is the interval between the rendition of the judgment and the awarding of the writ of inquiry.

Is this delay so culpable as to charge the executors with the loss resulting from the insolvency of Latimer? In pursuing this inquiry, the situation of the parties and of the cause must be taken into view.

When this attachment was sued out, no property on which it could be served was in the hands of the garnishee. The ginseng had been all shipped by Latimer, and the money in his hands had been attached by himself and by the assignees of West, both of which had a right to prior satisfaction. Had they proceeded with as much expedition as the course of the court would admit, to ascertain the amount of their damages, and to sue out upon the judgment for those damages, a scire facias against the garnishee, there must have been some complexity and delay in ascertaining the amount of the prior claims of the attachments of Latimer and of West's assignees, both of which had priority to theirs. It is not shown that a judgment against the garnishee could have been obtained before he became insolvent. At any rate, there was much reason to

[Brashear v. West and others.]

believe that the affair would be more expeditiously as well as more satisfactorily arranged by the parties themselves.

In November 1809, Nixon's executors addressed a letter to Walter Brashear, informing him of their attachment, as well as of that issued by West's assignees, and urging him to make provision for the sum which would remain due after exhausting the fund in the hands of Latimer. The letter concludes with saying, " we think a direction from you to Mr Latimer to pay over the balance due on your ginseng on the attachments would save you much interest; as many months must elapse before the law will possess either the assignees or us of our legal claims."

The record shows that the proceedings of the executors were embarrassed by the claims of West's assignees, on account of the surplus due on the notes assigned to John Nixon after payment of his debts. In a letter of the 7th of March 1810, to the assignees, they say, " enclosed is our reply of the 28th ultimo to Mr West's objections to the account of the late Mr Nixon, as rendered on his assignment. You will oblige us by considering our remarks, and withdrawing all opposition to our attachment on Dr Brashear's property in the hands of Latimer. You certainly can demand of us a settlement, and we must pay over to you any thing recovered beyond what will satisfy the just demand of Mr Nixon's estate." The letter referred to is also in the record. It shows that Mr West made specific objections to their claims.

After judgment against Latimer, the executors consulted counsel, whose opinion was that the garnishee might safely pay the money in his hands into court. The letter communicating this opinion is in the record. Mr Latimer states the fact in his deposition, but says that his counsel thought differently.

Late in 1810, or early in 1811, Dr Brashear was in Philadelphia. The executors addressed a letter to him of the 2d of February, in which they say, " we beg leave to call your attention to the following letter, and to state, your funds in Mr Latimer's hands must lie without interest under the attachment until they are divided; unless you order him to pay over the same in the proportions that are due, first to Mr West's assignees for the balance of your account as settled with Mr West when in Kentucky; and what remains on the two

notes in our possession, as stated in our letter of the 4th of November last, together seven thousand and fifty-five dollars sixty-three cents."

In a letter to Dr Brashear, after the failure of Latimer, they say, "it was our hope that before your departure for Kentucky an arrangement would have been made by you with Mr Latimer, which would have enabled us to have received from your effects in his hands the amount of your notes in our possession. In this expectation we were disappointed. Being left to legal remedy under the attachment, judgment has been had, &c."

It appears that Dr Brashear had full knowledge of the attachments, and might have directed Mr Latimer to bring the money into court. He was himself in Philadelphia, and might then have arranged the business according to his own judgment. He does not appear to have taken any step to facilitate its termination. He might have given special bail, and have released the attached effects. He has not done so.

We think the delay of Nixon's executors to proceed with the execution of the writ of inquiry to assess damages, is accounted for; and that it is by no means certain that had they proceeded with 'the utmost despatch, they could have forced the money out of the hands of the garnishee before his failure. We think that more blame attaches to Doctor Brashear than to the executors, and that the loss is to be ascribed to himself in a greater degree than to them.

The attachment sued out by the assignees of Mr West, in his name, is attended by different circumstances, and presents a question of more difficulty. The interval between their judgment and the failure of Latimer, was nineteen months. Their claim on the fund due from Latimer to Brashear, had priority to that of any other creditor. Mr Brashear states in his deposition, that a part of the ginseng, more than one third, was in his possession when the attachment for the use of the assignees was served. This ginseng was soon afterwards shipped by himself and another on their own account, and the sale was made with the consent of the assignees.

The act "about attachments" directs that the manner of executing the writ "shall be by the officer's going to the house, or to the person' in whose hands or possession the defendant's goods or effects are supposed to be, and then and there declaring in the presence of one or more credible persons in the

[Brashear v. West and others.]

neighbourhood, that he attacheth the same goods or effects. From and after which declaration, the goods, money or effects, so attached, shall remain in the officer's power, and be by him secured; in order to answer and abide the judgment of the court in that case, unless the garnishee will give security therefor."

The language of the act seems to require that the specific property attached should be taken into possession by the officer, unless the garnishee will give security therefor. At all events the law provides positively that they shall remain in his power. The reasonable construction of the act would seem to be, that if the officer leaves them in possession of the garnishee without security, he is himself surety for their forthcoming; and in the mean time he retains the power to remove them. The possession of the garnishee must be virtually his possession: and thus that power of the officer over the attached effects which the law requires would be preserved.

Mr Sergeant, in his Treatise on Attachment, p. 14, 15, says, "there can be no difficulty in the service of the writ in this case where the property is shown to the officer, and is admitted by the person in possession to be the property of the defendant in the attachment as alleged or supposed by the plaintiff. But the garnishee may conceal the alleged property, or contest the ownership, liability, &c. And of these and other circumstances, the officer cannot judge, but they are subsequently to be examined into and decided upon by interrogatories or by evidence on trial." In these cases the officer would not be bound to take possession or security from the garnishee, unless indemnified by the plaintiff.

In consequence of these and other difficulties, Mr Sergeant continues, "the usual practice is, where there is a garnishee, merely to serve a copy of the writ of attachment on the person named as garnishee with notice annexed by the officer, that by virtue of the writ of which that is a copy, he attaches all and singular the goods and chattels of the defendant in his hands or possession, and summons him as garnishee: in which case the return of the officer is in the same general terms; leaving the existence, nature, extent, and liability of the property to be developed in the subsequent proceedings by interrogatory or by evidence on the trial.

In the case at bar the officer proceeded in what Mr Ser-

geant says, is the usual manner. The service and the return were general, and the property remained in the possession of the garnishee. Yet there was no concealment of the property, nor contest about the ownership. The difficulties which caused the practice stated by Mr Sergeant did not arise. We are not informed whether this practice is understood in Pennsylvania to have so far changed the law, that no responsibility is in any case incurred by the officer who leaves the attached effects in the hands of the garnishee without security: nor are we informed whether these effects are supposed to remain in the power of the officer.

They must undoubtedly be to a certain extent in the custody of the law. If, under this modern practice, they are understood to be confided by the law to the garnishee, still he must keep them safely; and he is not at liberty to change them, to convert them into money, or to exercise any act of ownership over them.

The attachment for the use of the assignees was served in April 1809, and before the attached effects were shipped to China by the garnishee on account of himself and William Redwood. The assignees, as is stated by the garnishee, consented to the sale. They have then, by their own acts, aided the garnishee in violating the confidence reposed in him by the law, and the duty growing out of that confidence. If the goods were, in legal contemplation, still in the power of the officer, they have combined with the garnishee to take them out of his power. By this act a total loss has been produced. By converting this ginseng into a debt due from the garnishee they have made it his interest, if in declining circumstances, to interpose obstacles to the regular course of the law, and to delay the proceedings as far as might be in his power. He refused to bring the money into court when urged to do so by Nixon's executors. It is not probable that he would have refused to produce the ginseng. The plaintiff, on the most reasonable presumption, has lost the value of the ginseng which was attached in the name of West for his assignees, by this unjustifiable interference. We think them legally responsible for this loss.

The counsel for West's assignees contend that the testimony of Latimer ought not to be regarded, because, supposing the fact to be as charged in the bill, it is not proved as charged. The

[Brashear v. West and others.]

allegation of the bill is that the attaching creditors " permitted the whole fund to remain subject to the management of Latimer, even assenting and encouraging its export." Latimer says, " there was not any collusion, agreement or consent between the executors of Mr Nixon, or the assignees of Mr West and myself, that the property or money attached should remain in my hands, should be shipped abroad or should be used or disposed of in any way, *other* than the consent of the assignees of Mr West that the ginseng might be sold ; which consent was after their attachment and before that by Mr Nixon's executors.

At a time then when the ginseng was placed in the custody of the law, and withheld from the control of Brashear by the attachment of West's assignees, they consented to its being taken out of the custody of the law and sold. The loss of the article, so far as we can judge, is the consequence of this consent. That they did not mention its exportation, in terms, is we think unimportant. The place of sale was not prescribed. The foreign was the ultimate and the best market for the article. An unlimited power to sell, given to a person in the habit of exporting it to China, without mentioning the place of sale, included, and must have been understood to include a power to dispose of it in the usual manner.

The assignees also insist that the accounts furnish cause for believing that the witness is mistaken, in supposing that part of the ginseng was shipped after their attachment was levied.

If any obscurity exists in the testimony, the difficulty may be removed by leaving the fact to be investigated in the circuit court.

The assignees also insist on the fact that Latimer was the agent of Brashear for the purpose of selling his ginseng; and must still be considered as his agent in the sale itself. He must therefore be understood as selling with the consent of Brashear, as well as with that of the assignees.

But the attachment suspended all power of selling under the authority given by Brashear. To implicate him in this transaction, some actual interference on his part must be shown. None is even alleged. It is not to be presumed; for Latimer could not have paid the proceeds of the ginseng to Brashear while the attachment remained.

The counsel have insisted that the attaching creditors could

[Brashear v. West and others.]

not have taken the property out of the hands of the garnishee. Admitting them to state the law of Pennsylvania correctly, and we cannot doubt it, still the property was in the custody of the law, and would have remained safely in its custody, so far as we are informed by the testimony, had not the assignees consented to the removal of that protection.

We are of opinion that the plaintiff ought to have been allowed a credit for the amount of the ginseng sold by the garnishee with the consent of the assignees of West, and shipped by Latimer, for himself and Redwood. But that he ought not to have been allowed a credit for the money paid by him as special bail for George Anderson. The decree is to be reversed and the cause remanded to the circuit court with directions to reform the said decree according to this opinion. The parties to bear their own costs in this court.

On consideration of this cause, this court is of opinion that there is error in the decree of the said circuit court, in allowing to the said Walter Brashear, credit for the money paid by him as special bail for Francis West, at the suit of George Anderson; and also in refusing to allow the said Walter Brashear credit for the value of the ginseng, shipped and sold by the said James Latimer, with the assent of the assignees of Francis West, after the same had been attached in his hands, by the said assignees. It is therefore decreed, and ordered, that the decree pronounced in this cause by the court of the United States, for the seventh circuit, in the district of Kentucky, be reversed and annulled, and that the cause be remanded to that court, with instructions to perpetuate the injunction as to the sum which shall be equal to the amount of the ginseng shipped and sold by the said James Latimer, after the attachment sued out by Francis West for the use of Samuel Mifflin, James Lapseley, and Henry Nixon, assignees for the benefit of his creditors, was levied; and to dismiss the bill as to the residue.

And it is further ordered, that the parties pay their own costs in this court.

The same decree was entered in the case of West and others v. Brashear.