MATILDA BROWN, ADMINISTRATRIX OF GEORGE L. BROWN, DE-CEASED, APPELLANT, VS. CHAMBERLAIN, MILER & CO., APPELLEES.

B., without any writing whatever, but verbally and by word of mouth only, assigned, transferred and delivered to three of his creditors, constituting the firm of C. M. & Co., a package containing notes, drafts, &c., for near $30,-000, *in trust*, to collect and distribute the proceeds, as far as they would go, *pro rata*, between the assignees and his other "Charleston creditors," making no conditions or reservations in his own favor: Held, that this assignment was valid and irrevocable from the time of its acceptance by the assignees; that the privity or consent of the creditors was not necessary; that such assent will be presumed till the contrary appears.

This case was decided at Tallahassee.

A full statement of the case, and the evidence therein, will be found in the opinion of the Court.

*Banks & McLeod* for appellant.

*Sanderson and Daniels* for appellees.

WALKER, J., delivered the opinion of the Court.

The bill in this case was filed in the Circuit Court of the county of Alachua, to enjoin the collection and recover possession of a large number of notes, drafts and other evidences of indebtedness, amounting to near thirty thousand dollars, which Geo. L. Brown, in his lifetime, deposited with the defendants, as the bill alleges, for safe-keeping.

The defence set up in the answer is that the deposit was made by said Brown, not for safe-keeping but as collateral security to the debts he owed the defendants and his other Charleston creditors, and that said Brown verbally assigned, transferred and delivered said papers to defendants *in trust,* for the purposes aforesaid, on Sept. 21, 1857, in Charleston, and that defendants then and there accepted and assented to said trust, and from that time have held said notes, &c., for the purposes of said trust.

To determine the issue thus raised let us look to the evidence.

To support the allegation of the bill, that the deposit was a mere bailment for safe-keeping, we have the testimony of the following witnesses :

1st. Mr. Scott, a merchant of Newnansville, Florida, of which place Mr. Brown was also a citizen and merchant, states that he went from Newnansville to Charleston in company with Mr. Brown. "That the day after Brown deposited the notes with defendants, witness saw them in possession of Dan'l Miler, one of the firm of C., M. & Co. and

Miler, on that occasion, showed witness said notes, &c., and informed him that Brown had left said notes with them, (C., M. & Co.,) but that he, (Miler,) did not know for what purpose—supposed Brown wished to make some money arrangement with them on the papers."

2d. Mr. Lewellen Williams testifies that "he was the clerk of Brown in Florida; that he did not reach Charleston till some ten or fifteen days after Brown had been sick there; that after witness arrived in Charleston he made enquiries of Mr. Miler respecting Mr. Brown's money and notes. Witness new Brown had both money and notes with him when he left home; witness was his clerk and had delivered both to him. Miler told witness he had a package of Brown's which he supposed to be notes. Miler showed them to witness and said Brown had been round visiting all the merchants, and on his return had left the notes with them for safe-keeping; that after Brown's death, witness demanded the notes of Mr. Miler, and he refused, saying witness was no longer an agent or clerk of Brown after Brown's death, but that when any person administered on the estate and called for the notes, they would be delivered to them. This Mr. Chamberlain also assented to." "Witness demanded the notes of Miler at the Mill's House in Charleston—never had any conversation with Mr. Isaacs about the notes." (The firm consisted of Chamberlain, Miler & Isaacs.)

3d. Mr. Brown having died in Charleston, on the 8th of October, 1857, (seventeen days after the deposit was made,) his Charleston creditors, between the date of his death and the 30th of the same month, had a meeting, at which they appointed one of their number, Mr. O. J. Chaffee, to act as their agent. On the said 30th October, 1857, which was twenty-two days after the death of Mr. Brown, Mr. Chaffee wrote a letter to the widow of Mr. Brown, in which he said

TERMS HELD IN 1861. 467

Matilda Brown vs. Chamberlain, Miler & Co.—Opinion of Court.

among other things, "these are matters appertaining to your and our interests, which require consideration, and while wishing to avoid too soon calling your attention to them, we would respectfully suggest, that your interests as well as those of Mr. Brown's creditors require that no needless delay may be incurred in placing his estate under the best possible management. At a meeting of his creditors here (Charleston,) it was resolved to appoint an agent to call upon and co-operate with you *in the appointment of such an administrator* as would best adjust and settle the estate, and I was named as the person to represent them. As soon therefore as it will suit your convenience to see me on said mission, I will take much pleasure in visiting Newnansville, and I trust that no difficulty will be encountered in selecting *such a person* as will do full justice to yourself as well as to the other parties interested. *When* Mr. Brown arrived here, he stated *that it was his purpose to provide for the full security of his Charleston creditors, and at the same time deposited a package of notes with the firm of C. M. & Co. He afterwards appointed a time for meeting with his creditors, but his sickness became so serious that it was deferred, and he never after was sufficiently able to carry out his purpose. The papers here will be safely cared for and delivered to the proper party when appointed.*"

Subsequently, when Mr. Chaffee visited Florida, he did turn over a portion of these papers to Mrs. Brown, who had been appointed administratrix.

Such is the testimony to support the allegation of a bailment for safe-keeping, and it ·is certainly entitled to most serious consideration.

This letter of Mr. Chaffee's is, so far as we know, the first written testimony that was ever made concerning the deposit of these notes, and if we read it unassisted by other testimony, we certainly cannot conclude that when he wrote

that letter, Mr. Chaffee knew that the notes were the property of Chamberlain, Miler & Co., in trust for themselves and the other Charleston creditors. He no where hints in this letter to Mrs. Brown that such is the fact, although it was written immediately after a meeting of Brown's Charleston creditors, and only twenty-two days after Mr. Brown's death, and although the notes were the special subject of the letter. On the contrary, he tells Mrs. Brown that the creditors at their meeting had appointed him their agent to co-operate with her in the appointment of *such an administrator* as would best adjust and settle the *estate,* "that the papers then (in Charleston,) would be safely cared for and delivered to the proper party when appointed. That when Mr. Brown arrived in Charleston, he stated that it was his purpose to provide for the full security of his Charleston creditors; and at the same time deposited a package of notes with the firm of C., M. & Co.; that he afterwards appointed a time for meeting with his creditors; but his sickness became so serious, that he never was sufficiently able to carry out his purpose."

Now, if Mr. Chaffee at that time considered that C., M. & Co., owned these notes as assignees, why did he not tell Mrs. Brown so ? Why on the contrary did he tell her that the notes would be delivered to an *administrator* when appointed ? If C., M. & Co., were the assignees, it was clearly their business to collect the notes, and distribute the proceeds according to the trust, and not allow them to be delivered to the administrator. To promise to deliver them to the administrator, would seem to be an acknowledgement that they were the property of the administrator, and to say to Mrs. Brown, that when Mr. Brown arrived in Charleston, he stated that it was his purpose to provide for the full security of his Charleston creditors, that he at the same time *deposited* the notes with C., M. & Co., and afterwards ap-

pointed a meeting with his creditors, but was prevented by sickness and death from carrying his purpose into effect, was, in the absence of explanation, to tell her it was Mr. Brown's purpose to use these notes in some satisfactory arrangement, which he hoped to make with his creditors at the contemplated meeting, but that his sickness and death defeated this purpose. .

The letter of Mr. Chaffee is entitled to much consideration, because he appears from it to be a man of fine intelligence and kind and sympathetic feelings, and moreover, because he was in a position to know as much or more than any other man concerning the nature of the deposit. He was himself one of the creditors; he had seen Brown when he delivered the package to Isaacs, and had talked with both Brown and Isaacs about it. When he wrote the letter the subject was fresh in his mind, and the creditors had just had a meeting and appointed him their agent. At that meeting the matter of the assignment, if any was then understood to exist, was doubtless fully discussed. It is hardly possible that the creditors would fail to bring so grave a matter as the assignment directly to the attention of their agent; and, besides, is it not singular, if an assignment was then understood to have been made to Chamberlain, Miler & Co., that they did not, *as assignees*, give a power of attorney to Chaffee to act for them in *that capacity?* They seem not to have done so. Mr. Chaffee, in his testimony, speaking of his visit to Florida, says he "was acting as agent," (not of the assignees,) but "of the Charleston creditors of Mr. Brown, among whom was the firm of C., M. & Co."

If we read Mr. Chaffee's letter in the light of his subsequent action in actually turning over to the Administratrix of Brown a portion of the notes contained in the package claimed to have been assigned, and also in connexion with

20

the testimony of Scott and Williams, herein before recited, we will be inclined to the opinion that the allegation of a mere deposit for safe-keeping is sustained; and the more particularly when we remember that the habits of Mr. Brown at the time, were, unfortunately, such as to render such a deposit eminently prudent, and himself a very unsafe custodian of so large an amount of property, and moreover that an assignment of so great an interest in so loose a manner, is, to say the least of it, very unusual.

But let us give our attention now to the consideration of the testimony in favor of the defendants.

1st. In the first place we have the statements of the answer responsive to the bill, which are to be taken as evidence unless contradicted by two witnesses, or one witness and corroborating circumstances. See 2 Story's Eq. Jur. 1528.

The express allegation of the bill is that the notes were deposited with Daniel Miler, of the firm of C., M. & Co., *for safe-keeping*; that soon after the death of Brown, Miler admitted he held the notes on deposit, and agreed to deliver them to any legal representative when appointed. The fifth interrogatory of the bill, based on this allegation, is as follows: "Have you or not said notes in your possession now, or which or any of you? Was there any written assignment or transfer given you or any of you, by said Brown, deceased, and whether these notes were left with you for *safe-keeping*, or did you receive them in payment of any debt, and if so, were they all given for your debt, or were they to go to any other creditors of deceased, and if so, to which creditor? *State the bargain and transfer, if any such were made, specifically.*"

Directly responsive to this allegation and interrogatory, the defendants all answer upon oath, collectively and separately, that according to their and each of their knowledge, remembrance, information and belief, said notes, &c., were

*not* left with them or either of them, for safe-keeping, but were verbally assigned, transferred and delivered by Brown to Isaacs, one of said firm, to be by said firm collected, and the proceeds applied to the payment of the debts due from said Brown to defendants—all his other Charleston creditors in proportion to their respective amounts, so far as the amount realized therefrom would pay them, and for that express purpose and no other; that Brown stated at the time of this verbal assignment that he had talked with the other creditors and they assented to it; that the defendants then and there accepted the trust and received said notes for the purposes thereof, and have ever since, and do still hold them therefor.

In corroboration of these responsive statements of the answer, we have the testimony of Mr. O. J. Chaffee, Mr. A. F. Wilmans, Mr. Alfred Price and Mr. J. R. Robertson.

The testimony of Mr. Chaffee was admitted by consent, though he is one of the Charleston creditors interested in this suit. He testifies that on the morning of Monday, 21st September, 1857, he saw Mr. Brown in a chase in front of the store of C., M. & Co., when he handed a package of papers to Mr. Isaacs, one of the firm of C., M. & Co. Witness knew what purported to be in the package at the time of the delivery by Brown to Isaacs, and subsequently Brown informed witness that the package contained notes amounting to $26,000, *which he had placed* as collateral security with C., M. & Co., to his Charleston liabilities. Witness did not see the package opened at the time of its delivery. He relies on what Mr. Brown and Mr. Isaacs told him to identify the notes. The testimony of Wilmans and Price 's objected to before this Court on the ground that they are interested. They state that they were Charleston creditors of Brown, but have sold out their claims to the other creditors, and therefore are not interested. Be this as it may,

their testimony seems to have been admitted before the Circuit Judge without objection, and it is too late to object to its competency here, and there are no circumstances to make the Court receive it with more caution than that which necessarily attaches to the testimony of all interested witnesses. Wilmans testifies that Brown, on the 21st Sept., 1857, told him that he *had lodged notes and assets for about* $30,000 *with C., M. & Co., as collateral security for witnesses' firm and Brown's other creditors in Charleston*; that witness in consequence of the information received from Brown, enquired of C. M. & Co. whether the notes had been left, and was informed that they had; that Brown said at the same time that he intended to give *additional* security to his Charleston creditors. Price testifies the same as Wilmans, except that he says that Brown told him that the assets he had left with Chamberlain, Miler & Co., "were *sufficient to pay all he owed*" *in Charleston*, and does not say that Brown said any thing about giving *additional* security. This witness further says that soon after Brown left the store of Wilmans & Price, Mr. Miler, of the firm of C., M. & Co., informed witness "that the notes had been left as stated by Brown."

Mr. Joseph R. Robertson states that he is book-keeper for Horsey, Anton & Co., Charleston creditors of Brown; that on 21st September, 1857, he saw Brown at the store of said firm; that Brown called to arrange his liabilities; that he paid a small open account, and said that *he had left securities with Chamberlain, Miler & Co., for the purpose of paying his Charleston debts;* and among them his debt to F. M. Horsey & Co., and Horsey, Anton & Co.; that Brown asked for and received a statement of his indebtedness to those firms.

We have had very great difficulty in sifting and weighing this apparently conflicting testimony. As we have before

stated, the testimony of Scott and Williams as to the statements of Mr. Miler, taken in connection with the letter and subsequent action of Chaffee, would lead us strongly to believe that the deposit was a naked bailment. But, when we consider the oaths of all three of the defendants directly responsive to the bill that such was *not* the case, and that their testimony is corroborated by the subsequent declarations of Brown to Wilmans, Price, Chaffee and Robertson, we are made to pause, and ask if there is no way in which these conflicting statements may be reconciled. It is certainly a powerful circumstance, that in the life time of Brown, Mr. Miler said to Mr. Scott, that he did not know for what purpose the notes were left, and to Mr. Williams, that they were left for safe-keeping. But it is barely possible that Brown's arrangement having been made with *Mr. Isaacs,* Mr. Miler was not informed of its real nature, or for some reason may have desired not to communicate it. It is also a powerful circumstance, that immediately after the death of Brown, seventeen days after the deposit was made, Miler told Williams the notes would be delivered to Brown's administrator, and that on the 30th October, twenty-two days after Brown's death, Mr. Chaffee, the agent of the creditors, should have written the same thing to Mrs. Brown, and afterwards have followed it up by actually turning over to the Administratrix a portion of said notes. But, Mr. Miler, in the answer of defendants directly responsive to the fourth interrogatory of the bill, denies positively that he ever did promise to deliver those notes to Brown's legal representative ; and Chaffee testifies that he " gave up the unnegotiable notes to Mrs. Brown to conciliate her, and because he was doubtful whether they could be collected without being duly endorsed, and further, because he considered them of little value." Mr. Chaffee further testifies, that after Brown told him he had placed the notes as collateral, &c., he

Brown agreed with witness, that he would give, *in addition* to the collaterals, a mortgage on his real and personal property in Florida to cover his *entire* indebtedness to his Charleston creditors; that witness employed a solicitor to consummate this agreement with Brown; that this arrangement was not effected owing to the illness of Mr. Brown; that he was taken ill the night previous to the day fixed for the consummation of this arrangement.

Here, possibly, may be an explanation of that part of Mr. Chaffee's letter in which he says Brown's sickness and death prevented his carrying out his design in providing a *full* security for all his Charleston creditors. Take the letter alone, and it would appear that the notes were " *deposited* " with the view to some subsequent arrangement to provide for the full security of all his Charleston creditors; but take the letter in connexion with the writer's testimony, and it may mean that the notes were deposited in trust for his creditors; so that that part of the business was completed, and it was only the intention to give *additional* security that was defeated. In concluding our remarks on the letter of Mr. Chaffee, it is but fair to state also that he says he " *caused* " that letter to be written, and the writer may not have expressed the views of Mr. Chaffee as lucidly as he might have done himself, and although the letter promises to deliver the papers without qualification, yet Mr. Chaffee may have intended to impose upon the delivery the conditions which he actually afterwards imposed, to-wit: the payment of sixty per cent. of the amount due the Charleston creditors.

After the most thorough and patient investigation, therefore, we have concluded that the preponderance of the testimony is in favor of the fact, that Mr. Brown did, on the 21st September, 1857, make to C., M. & Co. a verbal assignment of the notes in controversy *in trust*, to collect and distribute

the net proceeds among all his Charleston creditors, in proportion to their claims, as far as said proceeds would go.

But it is contended, even supposing this verbal transfer to have been made, that the mind of Mr. Brown was not in a condition to transact business, and that the verbal assignment, if any such was made, is therefore void.

On this point we have no difficulty. The testimony of Dr. Fitch and four other witnesses satisfies us that on the 21st Sept., 1857, when the assignment is alleged to have been made, Mr. Brown was in his right mind and capable of making a valid assignment.

The next question naturally arising in this case is, can a party make an assignment, without writing, which will be enforced? The answer to this question seems to be that in *general* assignments, or those usually executed by insolvent debtors, a writing of some kind is always required, but in special or particular assignments a mere delivery of the subject assigned is sufficient to pass the property, and in equity many assignments are held good which are not evidenced by any writing. Burrel on Assignments, pages 92–'3. See also Hutchings vs. Low, 1 Green., (N. J., 246,) and Edison vs. Frazuer, 4 English, (Ark.,) 220, 221; Boyden vs. Moore, 11 Pickering, 362; Loften vs. Lyon, 22 Alabama, 540; Higgenbottom vs. Peyton, 3 Richardson's Equity, 398; Gordon vs. Green, 10 Georgia, 534; Dix vs. Cobb, 4 Mass., 50–511; White vs. Hunt, 1 Hill, (So. Ca.,) 187; 16 Johnson's Rep., 54; Jones vs. Winter, 13 Mass., 304; Ford vs. Stewart, 19 Johnson's Rep., 344; Prescott vs. Hull, 17 J. R. 17, 284; Canfield vs. Mungen, 12 John., 346; 1 Cain's R., 363; 3 J. R., 71; Alexander vs. Adams, 1 Strob. Law R., 47; Maybin vs. Kerby, 4 Richardson's Equity Repts., (So. Ca.,) 105; 1 Browne C. C., 269; Reeds vs. Simmons, 2 Dess., 552; Welsh vs. Usher, 2 Hill Ch., 17 and 421.

" A *special* or *particular* assignment is one which is made

directly to the creditor in payment or as security," and " a *partial* assignment is an assignment of a portion of the debtor's property in trust for the benefit of his creditors." Burrel on Assignments, 101. The assignment under consideration partakes of the nature of both. It is a special or particular assignment, inasmuch as it is made directly to the creditors constituting the firm of C., M. & Co., in payment or as security for themselves and other Charleston creditors, and it is also a partial assignment, as it is an assignment of a portion of the debtor's property for the benefit of his creditors. We hold, therefore, that the rules of law concerning both special and partial assignments, are applicable to this case.

Again, it was urged in argument by the learned and industrious counsel for complainant, that this assignment is void by reason of the want of the assent of the creditors before the death of the assignor, that it was revocable by the assignor in his life, and was revoked by his death, and furthermore that it is void for its uncertainty.

" It appears to be a settled rule in our law on the subject of the assent of creditors to the assignment, that assignments *directly* to the creditors are not valid without their assent ; but that assignments to *trustees* for their benefit, do not require such assent to render them valid and operative. A different rule prevails in England, and hence has arisen a material distinction between the forms of assignment in use in the two countries in regard to their legal qualities and effect as modes of provision for creditors. In the United States, a common form of assignment, (if not the prevailing form,) is that of two parts, executed between the debtor or assignor of the one part, and the assignee or trustee of the other part, without any creditor becoming a party ; and such an assignment on its acceptance by the assignee, is held to be valid and effectual as a provision for creditors, creating a

trust for them, which can be enforced in the proper Courts, and is *irrevocable* by the assignor. But in England, assignments in this bi-partite form, to which no creditor is a party, are called *deeds of agency*, or voluntary deeds of agency, which create no trust for creditors such as they can insist on being enforced, but are revocable at the pleasure of the debtor." Burrel on Assignments, 91–92. See remarks of Pearson, J., in Stimson vs. Fries, (2 Jones' Equity, 156, North Carolina,) and Ingram vs. Kirkpatrick, 6 Ire. Eq., 463.

In England, assignments to which no creditor is a party, are called *deedsof agency*, and are revocable by the assignor until communicated to, or assented to by the creditors; but if the assignee be a *creditor*, the assignment is irrevocable as to him. See Mackinnon vs. Stuart, 20 Law J. Rep., (N. S.) Chanc., 49, and the later case of Seggers vs. Evans, 32 English Law and Equity, 139.

But in the United States, as before stated, " it is a general rule, that when the assignment is to a trustee for the benefit of creditors, not parties to the deed, the assent of the creditors is not necessary to its validity, and the legal estate or title will pass to the assignee without such assent, so as to prevent a judgment creditor from acquiring a lien, if real, by his judgment, or if personal by his execution, unless upon the ground of fraud. This rule is said to be founded upon the established principle of the common law; that it is not necessary to the creation of a trust, by deed in favor of any person, that the *cestui que trust* should either be a party or assent to it. If the trust be for his benefit, the law *presumes* his assent to it until the contrary is shown; and it is clear that trusts may lawfully be created where there can be no present assent, for they may be in favor of persons not in existence. It is sufficient in general that in such cases there

21

is a competent grantor to convey, and a competent grantee to take the property. Deeds of trust, observes Chief Justice Marshall, are often made for the benefit of persons who are absent, and even for persons who are not in being ; whether they are for the payment of money, or for any other purpose, no expression of the assent of the persons for whose benefit they are made has ever been required as preliminary to the vesting of the legal estate in the trustee. Such trusts have always been executed on the idea that the deed was complete when executed by the parties to it. From these views, the rule has been deduced and very clearly laid down by Mr. Justice Story, in the leading case of Halsey vs. Whitney, that in case of an assignment to a trustee for the benefit of creditors, 'when the trust is for the benefit of all, and no release or other condition is stipulated for on behalf of the debtor, but the property is to be distributed equally among all the creditors, *pro rata*, the assent of the creditor must be *presumed;* for the trust cannot be for his injury, and must be for his benefit ; it must always be for his benefit to receive as much of his debt as a debtor can pay. If then, in such a case, such an assent be necessary, it may be *inferred* as a presumption of law until the contrary is shown.' That which purports to have been done for the benefit of creditors, observes Mr. Justice McLean, in the case of Lawrence vs. Davis, 3 McLean, 177, and which was manifestly for their advantage will be presumed to have been done with their assent unless the contrary appear. The same rule has been approved by the Supreme Court of the United States, (Brooks vs. Marbury, 17 Wheaton 7, and Brothers vs. West, 7 Peters, 608-613,) and in the case of Tompkins vs. Wheeler, (16 Peters, 118,) this rule was expressly applied to the case of an assignment *directly* to creditors ; the Court observing where the deed is absolute on its face, without any condition whatever attached to it, and is

for the benefit of the grantees, the presumption is, in the absence of all evidence to the contrary, that the grantees accepted the deed." (Burrel on Assignments, 331-332.)

It is not necessary for this Court to determine at present whether they do or do not approve of the ruling of the Supreme Court of the United States in Tompkins vs. Wheeler, but we unhesitatingly follow the current of American authorities, and therefore declare, that in the case under consideration, no express assent of or notice to the creditors, was necessary. And even though we should follow the English rule that the assent, or at least the privity of the creditors is necessary, it would make no difference in this case, as the statement of the answer, responsive to the bill, is, that Mr. Brown told defendants, at the time the assignment was made, that he had talked with the creditors, and they agreed to it. On the subject of the revocability of assignments, Mr. Burrel, in his work on Assignments, remarks as follows: " In England the doctrine seems to be now established that instruments of provision for creditors, corresponding with our deeds of assignment, to which no creditor is a party or privy, are revocable at the pleasure of the assignor. But in the United States, where, as a general rule, the assent of the creditors or their union as parties to the assignment is not necessary to its validity, the prevailing doctrine is that an assignment in trust for the creditors, executed and delivered by the assignor and accepted by the assignee, creates *at once* the relation of trustee and *cestui que trust* between the assignee and the creditors, and cannot be revoked by the assignor or annulled by the joint act of the assignor and assignee." Burrel on Assignments, 458; Ingram vs. Kirkpatrick, 6 Iredell's Eq., 462.

This Court, following the American rule, holds that the assignment in this case was not revocable by Mr. Brown in his lifetime, because it had been accepted by the assignees,

and there was at once created the relation of trustee and *cestui que trust* between them and the creditors. But even under the English rule it was not revocable, because the assignee in this case not only accepted the trust, but there had been communication and privity with the creditors, as according to the declaration of Brown to the assignees, he had talked to the creditors about the assignment and they agreed to it.

The only question now remaining for this Court to consider, is whether the assignment is void for uncertainty. We are of opinion that it is not. The assignor, the assignees, the property assigned, the class of creditors for whose benefit the assignment was made, and the interest they respectively took in the property assigned, are all stated with sufficient certainty. Where the property assigned is *delivered* at the time of the assignment, no schedule of it can be necessary to know with certainty what was intended to be assigned, and it is not unusual in assignments to name a *class* of creditors for whose benefit the assignment was made, without naming each individual creditor and the amount due each. "In a late case in New York it was held that a provision in an assignment directing the assignees, out of the net proceeds and avails of the assigned property, to pay to the *laborers* and workmen of the assignors, residing in Albany and Buffalo, the amount due to them respectively for work and labor done for the assignors, would not avoid the assignment, although the names of those creditors, with their places of residence and the respective amounts due to each, were not mentioned." Bank of Silver Creek vs. Talcott, 22 Barbour, 550.

We have now gone through with the consideration of all the points in this case deemed proper to its adjudication, and though we much regret the apparent looseness with

which so important an assignment was made, we are yet compelled, by our views of the testimony and the law, to affirm the decree of the Circuit Judge.

Let the decree be affirmed with costs. *Per curiam.*