CLAYTON v. JOHNSON.

1. ASSIGNMENT: *Statute of, is constitutional.*
   The statute of assignments (*Gantt's Digest, ch. X*), is not in conflict with any of the constitutions of this state. (EAKIN, J., dissenting.)

2. SAME: *When title vests in assignee: Replevin.*
   The filing of the schedule and giving the bond by the assignee as required by the statute, are conditions subsequent and not precedent to the vesting of the title to the property in him. It vests in him upon the execution and delivery of the deed by the assignor, and can not be defeated by an execution against the assignor, coming to the hands of an officer, after the delivery of the deed, and before the filing of the schedule and bond in the probate court; and if the officer levy such execution on the goods, the assignee may, after filing the schedule and bond, maintain replevin against him for the goods.

3. SAME: *Requiring full release from creditor, not fraudulent.*
   An assignment by an insolvent debtor of all his property for the benefit of his creditors, with a stipulation for a full release from the accepting creditors, is not fraudulent.

APPEAL from *Jefferson* Circuit Court.
Hon. X. J. Pindall, Circuit Judge.

*N. T. White* and *Met L. Jones,* for appellants:

The assignment does not comply with the statute. *Gantt's Digest, chap. X.* The execution was a prior lien when it reached the officer's hands.

Stipulation for a release on condition of receiving a benefit under the assignment is fraudulent, and avoids it. 14 *John.,* 458; *ib.,* 442, 448; 1 *Paige,* 24; 11 *Wendell,* 187, 202, 225; 6 *Hill* (*N. Y.*), 438; 32 *Barbour,* 240; 1 *Iredell's Law,* 490; 1 *Sm. & Mar. Ch.,* 208, 265; 10 *Watts,* 237; 1 *Davis,* 197; 5 *Ohio,* 289; 7 *Ohio,* 246; 2 *Bin.,* 182; 5 *Greenleaf,* 245; 9 *Porter,* 567; 33 *Ala.,* 643; 4 *Gill,* 129; *Freeman on Ex.,* 146, and *notes.*

Assignee not a *bona fide* holder for value. 4 *Wait's Practice,* 62; 5 *Denio,* 619; 4 *Hill,* 158; 3 *Barbour Ch.,* 630; 40 *N. Y.* (1 *Hand.*), 98; 11 *Paige,* 21.

Lien of state court paramount to proceedings in bankruptcy.

Assignment by insolvent debtor for benefit of creditors conclusive evidence of intent to defraud. 12 *Bank. Reg.,* 289.

*Bell & Elliott,* for assignee:

Filing bond *not* a condition precedent. If so, it was actually filed before levy. 14 *Ark.,* 568. A debtor may prefer creditors. 22 *Ark.,* 184; 32 *Ark.,* 399. Or make their release a condition of accepting an assignment. 7 *Peters* (*Brashear v. West*); 5 *Mass.,* 42; 8 *Pickering,* 63; 4 *Mason,* 206; 3 *Penn.,* 186; 2 *Bing.,* 174; 2 *Paige,* 490; 10, *Shep.* (*Me.*), 261, 457; 14 *Ala.,* 702; 17 *ib.,* 659.

Directions to trustee to sell to the best advantage did not.

vitiate. 21 *Barbour*, 128; *ib.*, 65; *Hill Ch.*, 443; 20 *Miss.*, 461; 2 *Green. Ch.*, 84 *N. J.*

Sheriff had no interest by the levy at the time of bankruptcy. The property was in the assignee. 22 *Ark.*, 535. If appellants had any lien it was a general one, to be enforced only in bankrupt courts. See 14 *Ark.*, *supra;* also, *Freeman on Executions*, *p.* 311.

ENGLISH, C. J. The deed of assignment under which the litigation in this case arose, is, in substance, as follows:

"Whereas, we, Chowning, Saunders & Co., a firm doing business in the city of Pine Bluff, etc., are indebted to McGehee, Snowden & Violett, of the city of New Orleans, etc.; E. T. Jaffrey & Co., of the city of New York; Renner & Co., B. Lowenstein & Co., and Schoolfield, Hannauer & Co., of the city of Memphis, etc., in a large amount of money, much beyond our ability to pay, and being desirous of securing said creditors, as well, also, as all other creditors whom we may be owing, now we, said Chowning, Saunders & Co., do hereby grant, bargain and sell to W. D. Johnson, assignee, in trust, for the benefit of our creditors, the goods, wares and merchandise hereto attached in schedule "A," made part of this conveyance, to have and to hold to him, in trust, as aforesaid, forever.

"We do likewise convey to the said W. D. Johnson, for the use aforesaid, and in trust aforesaid, all notes, books, accounts, and every class and character of evidences of debt to us belonging, or relating to our business in any manner whatever, with full authority in said Johnson to collect the same and apply them to the uses of this trust.

"The said Johnson shall proceed to sell said goods, etc., on the best terms he can, in his discretion, and the proceeds apply to the payment of our creditors, share and

share alike; provided, that no creditor herein provided for shall participate in the assets herein assigned unless he accepts the same in full of his claim; and provided further, that nothing shall be claimed or collected from Bettie Saunders or Dillard Saunders. This assignment to be closed up under the direction of creditors assenting to the same.

"This January 19, 1878.

"CHOWNING, SAUNDERS & CO."

It may be remarked, in passing, that it appears that Bettie Saunders and her husband, Dillard Saunders, were not indebted to the grantors at the time the assignment was made.

On the day the assignment was made (the nineteenth of January, 1878), the stock of goods in controversy in this suit were, under the deed of assignment, turned over to and taken possession of by Johnson, the trustee, and he made an inventory and prepared his bond as such.

The assignment was accepted by McGehee, Snowden & Violett, E. S. Jaffray & Co., W. A. Blome & Co., and other creditors, but not by Schoolfield, Hannauer & Co, nor B. Lowenstein & Co.

On the twenty-sixth of January, 1878, the two dissenting firms brought suit against Chowning, Saunders & Co., the makers of the assignment, before a justice of the peace of Vaugine township, in which Pine Bluff is situated. On the sixth of February following, they recovered judgment in the suits, and on the same day executions were issued thereon and placed in the hands of a deputy of John M. Clayton, sheriff, etc., at which time the goods in controversy were in the possession of the trustee, in said township, and locked up in a house in which they were kept, and had been in his actual possession for ten days. The

1. ASSIGN-
MENT:
Statute of,
is constitu-
tional.

sheriff's deputy demanded the key for the purpose of levying the execution on the goods, and the trustee said to him that he would give him the key or an answer in half an hour.    Before the expiration of the half hour, the trustee filed a schedule of the goods in the office of the clerk of the probate court, and procured the judge of said court to approve his bond as trustee, under the statute regulating assignments (see *Gantt's Dig., ch. X*), and then refused to surrender the key; whereupon the sheriff's deputy broke the door, levied the execution upon the goods, and took them into his possession.

Johnson, the trustee, brought this action against Clayton, the sheriff, in the circuit court of Jefferson county, and, on a trial before the court, obtained judgment.

I.    The ninth declaration of law, moved for appellee, vaguely expressed, was, perhaps, intended to question the constitutionality of the statute regulating assignments.    Its language is, that: "The probate court had no jurisdiction of the matters in controversy."    The court refused to make this declaration, but the judgment was in favor of appellee, he did not appeal, and if its refusal was an error, he was not prejudiced by it.    If, however, the statute is plainly in conflict with any provision of the constitution, it is invalid, and it would be useless to consider further a question in the case involving its construction.

The statute requires the assignee in an assignment of property for the payment of debts, to file in the office of the clerk of the probate court a full and complete inventory and description of such property.

It also requires the assignee to make and execute a bond to the state, in double the estimated value of the property in the assignment, with good and sufficient security, to be approved by the judge of said court, conditioned that such assignee shall execute the trust confided to him, sell the

property to the best advantage, and pay the proceeds thereof to the creditors mentioned in said assignment, according to the terms thereof, and faithfully perform the duties according to law.

Also, " That such assignee shall, at the first term of the probate court of the county in which such assignment is made, after one year from the date of said assignment, and at the corresponding term of said court every year thereafter, until the proceeds of the property assigned be disposed of for the benefit of the creditors, present to the probate court a fair written statement, or account current, in which he shall charge himself with the whole amount of the property assigned, including all debts due, or to become due, and credit himself with all sums of money expended, either by the payment of debts, or otherwise, exhibiting with such account the receipts and vouchers for all moneys paid out to the creditors of said assignment, which said account, so made out, shall be filed in the office of the clerk of the probate court of said county, and become a part of the record thereof; certified copies of which shall be competent evidence of the facts therein contained, in any of the courts of this state, in the same manner and to the same extent as the records of any other court."

Finally, that the assignee shall sell all the property assigned, etc., within 120 days after the execution of the bond, etc., and that any person damaged by his neglect, waste, or misconduct, may bring an action on the bond, in the name of the state, for his use, etc. *Acts of 1858–9, p. 151; Gantt's Digest, secs. 385–7.*

At the time the act was passed (February 16, 1859), the constitution of 1836 was in force; and, by it, the county judge was made judge of the court of probate, with such jurisdiction in matters relative to the estates of deceased

persons, executors, administrators and guardians as might be prescribed by law, etc.  *Art. 7, sec. 10.*

There was a similar provision in the constitution of 1864. *Art. 8, sec. 12.*

By the constitution of 1868, inferior courts, including courts of probate, and their jurisdiction, were under legislative control.  *Art. 8, sec. 5.*

At the time Gantt's Digest was made, the circuit courts were exercising probate jurisdiction, and hence the digester, in transferring the act, above copied, into the Digest, made some verbal changes in its provisions.  Thus, in the original act, the assignee is required to file the schedule *·" in the office of the clerk of the probate court,".* and in the Digest the words "in the office of the clerk of the *court exercising probate jurisdiction,*" are substituted, etc.

The constitution of 1874 restored probate jurisdiction to probate courts, and provides that: " The judge of the county court shall be the judge of the court of probate, and have such exclusive original jurisdiction in matters relative to the probate of wills, the estates of deceased persons, executors, administrators, guardians, and persons of unsound mind, and their estates, as is now vested in the circuit courts, or may be hereafter prescribed by law." *Art. VII, sec. 34.*

If there is any provision of the present, or previous constitutions, with which the act in question is so clearly in conflict as to warrant the court to pronounce it null and void—what provision is it?  Does it impose upon the probate court any duty, or jurisdiction, which, by any constitutional provision in force when the act was passed, or since, or now, is fixed in some other court?

The act requires the assignee to file a schedule' of the property assigned, in the office of the clerk of the probate court.  Schedules attached to mortgages and deeds of trust,

with a provision for redemption, or defeasance, may be filed and registered with the deeds to which they are attached, in the recorder's office, to fix liens, for notice, etc. Absolute assignments to pay debts, with schedules attached, may be filed in the recorder's office, also; but if the legislature thought proper to require the assignees, in such assignments, to file schedules of the property embraced in them, in the office of the clerk of the probate court—why not? The probate court is not required to do any judicial act in relation to such schedule. It is merely to be filed in the office of the clerk, and remain there. True, it was, doubtless, the intention of the legislature that it should there remain, for comparison with the accounts of the assignee to be afterwards filed, and of which we will treat below.

The act also provides that the assignee shall make a bond, to be approved by the probate judge. This bond is for the protection of the creditors, etc. The assignee is a trustee in a private trust, and not a public officer. The approval of such a bond is a ministerial act, which, like the taking of the acknowledgments of deeds, might be intrusted to any officer, at the pleasure of the legislature. See, on this subject, *Oliver, Sheriff, v. Martin, Judge, etc., ante.*

The legislature may authorize a judge to do a ministerial act in no way inconsistent with or repugnant to his judicial functions under the constitution. *State v. Collins, 19 Ark., 589.*

The legislature seems to have regarded property assigned for the benefit of creditors as like the estate of a dead man. The assignee is required to file a schedule, give bond, and present to the probate court, and file in the office of its clerk, annual accounts, as is required of administrators, executors and guardians. But here the analogy ceases. The act does not attempt to require, or authorize, the probate court to examine, confirm, modify, or reject, such ac-

counts, or do any judicial act in relation to them, but they are merely filed in the office of the clerk of the court, and become part of the records thereof. These accounts are merely thus preserved as memorials, and if any adjudication is had, at any time, upon them, it must be in some other court having jurisdiction of the settlement of trusts.

It would, doubtless, have been more appropriate legislation, if the act had required the schedule and accounts to be filed in the office of the clerk of a court exercising chancery jurisdiction, so that if disputes arose between the assignee and the creditors, they might be settled by the Chancellor, and the trust administered and closed under his orders. But when legislation is confined to ministerial acts, and does not invade the constitutional jurisdiction of any court, its expediency is a question of legislative discretion.

Whether the legislature may give the unconfirmed and unadjudicated account of an assignee, filed in the clerk's office, and made a part of the probate records, the verity of a judicial record as evidence in the courts, is a question not presented in this case, but if the act has attempted to give such a record an unwarranted grade as evidence, the whole act would not therefore be void, but as in the case of the tax deed act, the courts would assign to it its proper grade as evidence, and so limit the expressions of the act. *Cairo & F. R. R. Co. v. Parks, 32 Ark., 131.*

We conclude that the act in question has run the gauntlet of all the constitutions, and escaped, though narrowly, conflict with any of their provisions, and that it is the duty of an assignee in a deed of assignment to file a schedule of the property embraced in it in the office of the clerk of the probate court, and execute a bond, to be approved by the probate judge, as required by the act.

In a number of the states similar statutes require the

Clayton v. Johnson.

schedules to be filed, and the bonds to be approved in the probate courts. *Burrill on Assignments, 2d ed., pp. 477, 482.*

II. The next, and most difficult question directly pre- [2] When the title vests sented in this case is, does the title to the property pass to in assignee. and vest in the assignee on the execution and delivery of the deed of assignment, or does it remain in the makers of the deed until the assignee files the schedule, and makes and obtains the approval of the bond as required by the statute?

. After the execution and delivery of the deed to the assignee, and before he had filed the schedule, and procured the approval of his bond, executions of the dissenting creditors were placed in the hands of the sheriff, and were liens on the goods. *Isbell et al. v. Epps et al., 28 Ark., 35.* The court below, in effect, declared the law to be, that the title of the assignee was prior, and superior to the execution liens, and that the filing of the schedule, and the making of an approved bond were conditions subsequent, and not precedent to the vesting of the title of the assignee.

The language of the first section of the statute is:

"That in all cases, in which any person shall make an assignment of any property, whether real, personal, mixed, or choses in action, for the payment of debts, *before the assignee thereof shall be entitled to take possession, sell, or in any way manage or control any property*, so assigned, he shall be required to file in the office of the clerk of the probate court a full and complete inventory and description of such property; and also make and execute a bond to the state, etc., with good and sufficient security, to be approved by the probate judge, etc., conditioned," etc.

The fact that the goods were in the actual possession of the assignee, and had been for more than ten days before the executions came to the hands of the sheriff, did not

help his title, for the statute forbid him to take possession before he filed the schedule, and gave bond.

But for the statute, by the common law, the title would pass to him on the execution and delivery of the deed. The statute does not say that the title shall not vest in him before he files the inventory, and gives the bond, but that before he shall be entitled to take possession, etc., he shall be required to file the schedule, and make the bond, etc.

Commencing with a decision nearest home, and entitled to much respect, it has been decided in the circuit court of the United States for the eastern district of Arkansas, in the case of *Bartlett, Reid & Co. v. Teah, et al.*, reported in volume 1 of the Federal Reporter, 768, that the title to the property embraced in the assignment does not vest in the assignee until he files the schedule, and gives the bond required by the statute; that these are conditions precedent, and not subsequent, and that if the property is attached between the execution and delivery of the deed, and the filing of the schedule and the giving of the bond, the attachment will hold the property. The learned judge who delivered the opinion, cites *Juliad v. Rathbone 39 New York, 369 ; Hadmann v. Brown, ib., 196 ; and Britton v. Lorenz, 45 ib., 51.*

Section 1 of the New York statute of assignments declares that "every conveyance or assignment made by a debtor or debtors, of his, her or their estates, real or personal, or both, in trust to an assignee or assignees for the creditors of such debtor or debtors, shall be in writing, and shall be duly acknowledged before an officer authorized to take the acknowledgment of deeds, and that the certificate of such acknowledgment shall be duly indorsed upon such conveyance or assignment, *before the delivery thereof to the assignee or assignees therein named.*"

In *Hadmann v. Brown, sup.,* the deed of assignment was

executed and delivered to the assignee, and he took possession of the property, but the deed was not acknowledged, as required by the statute, and the property was attached by a creditor. The court held that it was a violation of the plain mandate of the statute for the grantor to deliver the deed without acknowledgment; that the title to the property did not vest in the assignee, and that he could not hold it against the attaching creditor.

The decision was followed in *Britton v. Lorenz, 45 N. Y., 51.*

. Our statute of assignments does not require the deed to be acknowledged by the grantor before delivery to the assignee. Other statutes regulate the acknowledgment of deeds, mortgages, etc., for registration, notice, fixing liens, etc., but no question arises upon them in this case.

Section 2 of the New York statute provides that the assignor shall, at the date of the assignment, or within twenty days thereafter, make and deliver to the county court of his residence, a schedule, verified by him, as prescribed by the act, containing a full and true account of all his creditors, and their residences, as far as known, and the nature of the debt, and how it arose, the consideration of the debt, and place where it arose; a statement of any security for any debt; an inventory of all his estate, and the incumbrances thereon, if any, and of the value of such, according to the best knowledge of the debtor.

Section 3 provides that the assignee shall, within thirty days after the date of the assignment (and before he shall have power or authority to sell, dispose of, or convert to the purposes of the trust, any of the assigned property), enter into a bond with securities, as prescribed by the section, etc. See *Juliad v. Rathbone, 39 N. Y., 371.*

The statute is silent as to the effect of the omission of the assignor to make and file the schedule, or of the

27—36

assignee to give the bond. It was decided in *Juliad v. Rathbone, 39 Barbour, 101,* that the provisions of the second and third sections of the statute were directory, that the title to property vested in the assignee on the execution and delivery of the deed, and his omission to give bond might be treated as a refusal to serve, and justify an application for a receiver.

The court said: " It can not be that the assignee takes only the conditional title, subject to be deprived of it if the inventory is not delivered in twenty days, or the bond executed in thirty days. This statute contains no such provision and has no such effect; and previous to the statute the law was well settled that on the delivery of the assignment the title passed, and the rights of the creditors under it became vested and fixed, and could not afterwards be impaired by any act or omission of duty by the assignee. If valid in its creation no subsequent illegal acts of the assignor or assignee could in any manner invalidate it." This decision was rendered in July, 1862, in the supreme court.

In *Hadmann v. Brown, supra* (court of appeals, March, 1868), the court, by Justice MASON, said: " This case (*Juliad v. Rathbone*) was rightly decided, and has been affirmed by several subsequent cases. *Van Vleet v. Slanson, 45 Barb., 317; Evans v. Chaplin, 20 How., 289; Barbour v. Evans, 16 Abbott, 366.* These were cases well decided, and repose upon the soundest principles of statute construction. The section which requires the assignor within twenty days to make out an inventory of his debts and assets, and deliver the same to the county judge, containing no negative words against the exercise of the right to make it afterward, was held to be merely directory as to time, as the statute was entirely silent as to the effect of the omission to do so. The same was also held in regard to the omission to give the bond within thirty days."

But the same court of appeals, in *June*, 1868, on appeal, in *Juliad v. Rathbone*, opinion by Justice GROVER, taking no notice of the March opinion, decided that the filing of the schedule by the assignor, and the giving of the bond by the assignee, were conditions precedent to the vesting of the title to the property in the assignee; that until both were done the title remained in the assignor, and if not done within the time required by the statute, the assignor might make a *bona fide* sale of the property, or a new assignment. *Juliad v. Rathbone, 39 New York, 369*.

If this be law, a debtor might make a deed of assignment of real and personal property, acknowledge it as required by the conveyance statute, deliver the deed (with a schedule attached, if necessary,) to the assignee, who might accept it, and file it in the recorder's office for registration, and yet no title would vest in him until he filed a schedule of the property in the office of the clerk of the probate court, and prepared a bond and procured the probate judge to approve it, as required by the assignment act; and in the meantime, if delay occurred, any dissenting creditor might make a valid seizure of the property on execution or attachment, or the assignor might change his mind, and sell or make a new assignment of the property.

The above New York decisions were made under the act of 1860, above copied, in substance.

In *Produce Bank v. Morton et al., 67 New York, 203*, the court of appeals, by Justice RAPALLO, said: "In the case of *Juliad v. Rathbone, 39 New York, 369*, it was held that the making and delivery of the verified schedules required by section 2 of the act of 1860 (chapter 348) were essential to the validity of the assignment. But since that decision the legislature passed the act of 1874 (chap. 600, p. 824,) which provides that the omission to make or deliver the schedule shall not invalidate the as-

signment. We think that it was the intent of this act to abrogate the rule laid down in *Juliad v. Rathbone*, and the provision allowing the assignor within six months to file schedules, was not intended as a condition, the breach of which should invalidate the assignment. It can hardly be supposed that it was the intention of the legislature to leave it uncertain during the six months allowed for the filing of the schedules, whether the title to the property was in the assignee, or to deprive him during that interval of the power of making any valid disposition of it."

By an act of 1875, the act of 1860 was still further amended, by providing that the assignee, in any such assignment shall, within ten days after the delivery to the county judge of the inventory and schedule, and before he shall have power or authority to sell, dispose of, or convert to the purposes of the trust any of the assigned property, enter into bond, etc.

In *Thrasher v. Bently, 59 New York, 649, 1 Abbott's New Cases, 39*, the bond of the assignee was approved by a special judge, instead of the regular county judge, and the court of appeals held that if the bond was invalid for that reason it did not affect the validity of the assignment.

And in *Worthy v. Benham, 20 New York Supreme Court, 177*, it was held (citing the above case) that "the statutory provision on this subject seems to intend, not that a failure to enter into bond within the ten days shall have the effect to avoid the assignment, but to prohibit the assignee from selling the assigned property, or converting it to the purposes of the trust, until he shall have entered into such bond. Such seems to be the view the courts have taken of that provision since the case of *Juliad v. Rathbone.*"

In this case the bond of the assignee was not made and approved within the time required by the statute, and it

was held that such failure to comply with the statute did not invalidate the assignment.

By our statute when the assignor makes and delivers the deed of assignment to the assignee, the conveyance on his part is complete. He is not required to file a schedule of the property embraced by the deed in the office of the clerk of the probate court; that, as well as the giving of a bond, being a duty imposed upon the assignee for the benefit of the creditors.

If the conveyance be of numerous tracts of land, inconvenient to describe in the body of the deed, and the assignor make and attach to the deed a schedule of the lands, and deliver it with, and as part of, the deed, to the assignee, he would not file it in the office of the clerk of the probate court, but it would remain attached to the deed, and if the deed be acknowledged for registration, the schedule would be filed with it in the recorder's office; and the assignee would make and file in the office of the probate clerk, his own schedule.

So if, in an assignment of goods, choses in action, etc., the articles be numerous, and the assignor attach to the deed a schedule for identity, this would not relieve the assignee from making a schedule to be filed by him in the office of the probate court.

But whether the conveyance be of real or personal property, and whether the assignor make and attach to the deed a schedule or not, the assignee must file a schedule of the property embraced by the deed, before he can take possession of, sell, or in any way control or manage it. If the property be goods, choses in action, etc., he is entitled to access to them for the purpose of making the schedule, if the assignor has not attached to the deed a satisfactory one.

The argument is not without force, that it is an anomaly

that one may have title to property without power to take possession of and dispose of it. But the statute does not declare that the title to the property embraced in the assignment shall not vest in the assignee on the execution and delivery of the deed to him, but provides, for the benefit and protection of creditors, that before he shall take possession, sell, or in any way manage or control it, he shall file the schedule and give bond, etc.

If he fail to comply with the requirements of the statutes, the remedy, by application to chancery, on the part of the creditors, is simple.

By an Indiana statute regulating assignments, the trustee is required to take an oath, before entering upon the trust, that he will faithfully execute the same, etc.

In *Wright et al. v. Thomas et al.*, *1 Federal Reporter*, *716*, Judge DRUMMOND held, that the failure of the trustee to make the oath required by the statute, did not invalidate the assignment.

In *Hardcastle v. Fisher*, *24 Mo.*, *74*, held, that the omission of the trustee to file an inventory and give security, or to discharge any other duty imposed upon him by the statute, did not affect the rights of the creditors.

An Iowa statute allowed the trustee twenty days after the assignment in which to give bond. In *Price v. Parker*, *11 Iowa*, *144*, after the execution of the assignment, and before the trustee gave bond, the sheriff levied on goods embraced in the conveyance. *Held:* That the trustee could maintain replevin for the goods.

In *Bancroft et al. v. Snodgrass et al.*, *1 Caldwell (Tenn.)*, *435*, held, that the failure of the trustee to make a valid bond and take an oath, as required by statute, in no way affected the validity of the trust; that, in equity, a trust is never allowed to fail, or be affected for want of a trustee.

Clayton v. Johnson.

We think, upon principle and upon the weight of adju- <span>The filing of the schedule and giving bond are conditions subsequent and not precedent to the vesting of title.</span> dications, that, under our statute, the filing of the schedule and the giving of the bond by the assignee, are conditions subsequent, and not precedent; that, on the execution and delivery of the deed of assignment to the assignee, the legal title to the goods in controversy vested in him, and his title was not defeated by the coming of the executions of the two dissenting creditors to the hands of the sheriff before he filed the schedule and gave bond, and that, after the schedule was filed and the bond given, the assignee could maintain replevin against the sheriff for the goods, he having seized them under the executions; and that the ruling of the court below on this feature of the case was correct.

III.  It appears, from the agreed statement of facts upon <span>3. ————: Requiring full release from creditors, not fraudulent</span> which the case was tried below, that, at the time the assignment was made, the assignors were indebted to:

McGehee, Snowden & Violett in the sum of........$5,000 00
E. S. Jaffray & Co....................................... 4,149 00
W. A. Renner & Co..................................... 1,241 26

And others, amounting in all, including the above, to the sum of $14,000.

That they were indebted to Schoolfield, Hannauer & Co., one of the dissenting firms, on two claims, one for $299.75, and the other for $299.74; and to B. Lowenstein & Co., the other dissenting firm, in the sum of $153. (These were the claims on which judgments were obtained, executions issued and levied on the goods in controversy). That the assignment was made at the request of, and accepted by, all of the creditors except these two firms, and that the goods, etc., assigned, were not near sufficient to pay all the creditors. It does not appear that the assignors owned any property other than that embraced in the assignment. No actual fraud is shown.

The court below refused to declare the law to be that the deed was fraudulent and void as to the dissenting creditors, because of the clause in it that no creditor should participate in the assets unless he accepted the same in full of his claim.

Under the assignment act, the assignee is required to sell all the property assigned to him for the payment of debts, at public auction, within one hundred and twenty days after the execution of the bond, which he is required by the act to give.

An insolvent debtor can not, therefore, by assignment, tie up his property in the hands of an assignee for an indefinite period, with the view to coercing any reluctant creditors to accept a provision which they may dislike.

By the statute of frauds, " Every conveyance or assignment, etc., made or contrived, with the intent to hinder, delay or defraud creditors, or other persons of their lawful actions, damages, forfeitures, debts or demands, as against creditors and purchasers prior and subsequent, shall be void." *Gantt's Digest, sec. 2954.*

In *McCain, Admr., v. Pickens et al., 32 Ark., 399,* there was a provision in the deed of assignment, that accepting creditors should release the assignor, but it did not appear that any creditor accepted the provisions of the trust, and the court held that their assent to such an assignment would not be presumed. The question whether the deed was fraudulent and void, because of such provision for a release, was not presented, nor has it heretofore been decided by this court.

In England, a stipulation in an assignment for the release of the debtor as a condition of receiving the benefit of the deed, has been held valid even against a claim of the crown (*King v. Watson, 3 Price Exch., 6*), and such stipulations

continue to be inserted in the forms now in use. *Burrill on Assignments, 2d ed., p. 156.*

In *Jackson v. Lomas, 4 Durnf. & East., 165*, there was a proviso to the assignment, that, in case any creditor should not execute the trust deed, which contained, among other things, a release of the debts, by a given day, he should not be entitled to the benefit of it, and the validity of the deed seems to have been conceded.

There was also a provision in the deed that the share of any non-accepting creditor should be paid back to the debtor. Mr. KENT, commenting on that case (*2 Commentaries, 534, 12th ed., p. 736*), says that such a reservation for the benefit of the debtor would render the deed invalid under many of the American decisions.

The leading American case on the precise question now before us, is *Brashear v. West, 7 Peters, 608.*

In that case, West executed a deed in April, 1807, at Philadelphia, by which he conveyed to trustees, all his estate, real, personal and mixed, in trust, to sell the same as soon as conveniently might be, and to collect all debts due to him, and to pay and discharge the debts due from him, first to certain preferred creditors, and afterwards to creditors generally; " provided, nevertheless, that none of the above described creditors shall be entitled to receive any part or dividend of the property hereby conveyed, or its proceeds, who shall not, within ninety days from the date hereof, sign and execute a full and complete release of all claims and demands upon said West, of any nature or sort whatever."

Chief Justice MARSHALL, who delivered the opinion of the court, said: " The most serious objection to the deed is, that it excludes all creditors who shall not, within ninety days, execute a release of all claims and demands on said West of any nature or kind whatever.

Clayton v. Johnson.

" The stipulation can not operate to the exclusion of any portion of a debtor's property from the payment of his debts. If a surplus should remain after their extinguishment, that would be rightfully his. Should the fund not be adequate, no part of it is relinquished. The creditor releases his claim only to the future labors of his debtor. If this release were voluntary, it would be unexceptionable. But it is induced by the necessity arising from the certainty of being postponed to all those creditors who shall accept the terms by giving the release. It is not, therefore, voluntary. Humanity and policy, however, both plead so strongly in favor of leaving the product of his future labor to the debtor, who has surrendered all his property, that, in every commercial country known to us except our own, the principle is established by law. This certainly furnishes a very imposing argument against its being deemed fraudulent.

" The objection is certainly powerful that its tendency is to delay creditors. If there be a surplus, this surplus is placed, in some degree, out of the reach of those who do not sign the release, and thereby entitle themselves under the deed. The weight of this argument is felt; but the property is not entirely locked up. A court of equity, or courts exercising chancery jurisdiction, will compel the execution of the trust, and decree what may remain to the creditors who have not acceded to the deed. Yet we are far from being satisfied that, upon general principles, such a deed ought to be sustained.

" But whatever may be the intrinsic weight of the objection, it seems not to have prevailed in Pennsylvania. The construction which the courts of that state have put on the Pennsylvania statute of frauds, must be received in the courts of the United States.

"In *Lippincott et al. v. Barker*, *2 Binney, 174*, this question

arose, and was decided, after elaborate argument, in favor of the validity of the deed. This decision was made in 1809, and has, we understand, been considered ever since as settled law.

"In *Pierpont & Lord v. Graham, 4 Wash., 232,* the same question was made, and was decided, by Judge WASHINGTON, in favor of the validity of the deed. This decision was made in 1816. We are informed of no contrary decision in the state of Pennsylvania, and must consider it as the settled construction of their statute. The validity of the deed can not now be controverted, no actual fraud being imputed to it."

This opinion of the supreme court of the United States was delivered by Chief Justice MARSHALL, in January, 1833.

The argument of Chief Justice TILGHMAN, in *Lippincott v. Barker, 2 Binney, 180,* in favor of the validity of the deed in that case, which was an assignment of all the debtor's property for the benefit of his creditors, with a condition for release, and without reservation for the benefit of the debtor, is very cogent and persuasive. The decision is not put upon any peculiarity in the statute of frauds of Pennsylvania, but upon principles announced.

This decision has been repeatedly followed in Pennsylvania, and has not been overruled. See references to the cases in *Brightly's Digest, Title Assignment; Burrill on Assignment, 2d ed., p. 159.*

In *Leah's Appeal, 9 Barr., p. 506,* the court said that the stipulation for a release was in accordance with the spirit of the bankrupt laws of the commercial world, and with the spirit of the age, that where an unfortunate debtor surrenders all his property to his creditors for their benefit, he ought to be allowed to begin the world again untrammelled, for his own benefit and that of his family.

The question was before the court of appeals of Virginia, 1837, in *Skipwith's Exr. v. Cunningham, 8 Leigh, 271.* The debtor made a general assignment to trustees to pay certain preferred creditors, and then all others *pro rata* who would execute a release, etc.

The opinion of the court was delivered by HENRY SAINT GEORGE TUCKER, president, who, after showing that it was not against the statute of frauds for a merchant, in failing circumstances, to prefer one class of creditors to another, etc., said : "Next, it is said that the deed was a fraud upon the creditors generally, because it demanded a general release of the whole debt of each creditor, upon payment of a part. On this subject a distinction has been made in the cases, between the conveyance of the *whole,* and the conveyance of a part only of the debtor's property, upon condition that the creditors should compound, and accept a part of their debts, and give a release for the residue. The former is considered admissible and valid—the latter as oppressive upon creditors, and as fraudulent and pernicious in its tendencies. (*Leaving v. Brinkerhoff, 5 Johns. Ch. Rep., 332*). The English cases are all founded upon the *concession* of the principle that such compositions are lawful, where the party has conveyed the *whole* of his property, and there is no concealment or underhand agreement with particular creditors. (*Cockshoot v. Bennett, 2 T. R., 763; Jackson v. Lomas, 4 T. R., 166*). Such compositions are in the spirit of the bankrupt laws, and can not, therefore, be branded with imputation of fraud.

"Humanity and policy," says the chief justice of the United States, "plead so strongly in favor of leaving the product of his future labor to the debtor who surrendered *all* his property, that in every commercial country known to us except our own, the principle is established by law." (He means that the principle is established by the statute

law, and compulsory.) "This furnishes a very imposing argument against its being a fraud." *Brashear v. West, 7 Peters, 615.*

"It is difficult, indeed, to imagine on what the right of composition by the assent of the creditors can be contested, if the right of preference be conceded. He who gives up his all, and who, in doing so, has a right to pay one in exclusion of others, can not justly be charged with fraud, because he prefers those who humanely surrender all claim to his future labors. To set aside such preference as fraudulent, is to deny the right to prefer, which, on all hands, is conceded. Accordingly, such agreements, if executed, are acknowledged to be valid and binding. *Heathcote v. Crooshanks, 2 T. R , 24; Lynn v. Bruce, 2 H. Black., 317.* But it is not less true, that if they are of only part of the debtor's property, the transaction is oppressive upon the creditors, and fraudulent. A debtor is bound by duty to devote the whole of his property to the satisfaction of his creditors' demands. (*7 Peters, 614.*) He can have no right, while he is full-handed, to extort from them a release of part of their just claims. * * * It is a contrivance on the debtor's part to protect and secure a part of his property from his creditors, and is, therefore, distinctly in conflict with that statute, which avoids every contract or conveyance of a debtor, contrived of purpose to hinder, delay or defraud creditors. He may protect his *person*, indeed, by a fair composition, and surrender of all his property, but he can not protect a part of that property by giving up another part," etc.

This decision was followed in *Phippen v. Durham et al., 8 Grattan, 457*, and as late as 1868, in *Gordon et al. v. Cannon, 18 ib., 387.*

The question was before Judge STORY, 1826, in *Halsey et al. v. Whitney, 4 Mason, 206*, on a deed by which a debtor

made an assignment of all his property to a trustee, in trust, for certain of his creditors who should become parties to the assignment; and upon the consideration that they should release all their respective claims and demands upon him.    After reviewing the adjudications, and showing that in Massachusetts the decisions left the question in equilibrio, he said : "In *Lippincott v. Barker, 2 Binney, 174,* where the direct point arose, it was settled, that a stipulation for a release was not fraudulent.    The reasoning of the court is limited, indeed, to the circumstances of that particular case, but it would be difficult not to perceive that it naturally reaches further.    I find, also, that my brother, Mr. Justice WASHINGTON, in *Pierpont v. Graham (4 Wash., 232),* is reported to have held, that an assignment in trust, for the benefit of such creditors as should release their debts, is founded upon a sufficient consideration in law.    The case is not in point, but it was properly decided on the general principle.    There is, however, a case in England directly in point.    It is, *The King in Aid of Braddoch, 3 Price, 6,* where the very exception was taken by counsel, and the assignment was held good by the court of exchequer against the claim of the crown itself.

"The weight of authority, then, is in favor of the stipulation; for the decisions in New York did not turn upon the naked point of a release, but upon that as incorporated in a peculiar trust.    I am free to say, that if the question were entirely new, and many estates had not passed upon faith of such assignments, the strong inclination of my mind would be against the validity of them.    As it is, I yield, with reluctance, to what seems the tone of authority in favor of them."

In his *Equity Jurisprudence, 2d vol., sec. 1036, 12th ed.,* Judge STORY said: "Even a stipulation on the part of the debtor, in such an assignment, that creditors taking under

it shall release and discharge him from all their further claims beyond the property assigned, will, it seems, be valid. Citing in note, *Halsey v. Whitney, 4 Mason, 206,* and other cases.

In Alabama, it was settled, by a series of adjudications, that a debtor could, in an assignment of all his property for the benefit of his creditors, making no reservation to himself, stipulate that the creditors accepting the assignment thus made should release him from all further liability. *Robinson v. Rapelye, 2 Stew., 86; Ashhurst v. Martin, 9 Port., 566; West, Oliver & Co. v. Snodgrass, 17 Ala., 549; Rankin et al. v. Lodor, 21 Ala., 380.*

But by a provision of the Code of 1866, it was declared that an assignment stipulating for such release should be void as to creditors. *Perry Ins. and Trust Co. v. Foster, 58 Ala., 513.*

In Maine, a stipulation for a release was held valid. (*Fox v. Adams, 5 Greenleaf, 209; Todd v. Buckman, 2 Fairf., 11 Maine, 41.*) But this was changed by statute. *Pearson v. Crosby, 23 Maine, 263; Wheeler v. Evans, 26 ib., 135.*

In Maryland, it has been decided, on principle, that the debtor might stipulate for a release, but there were dissenting opinions. *McCall et al. v. Hinkley et al., 4 Gill, 128; Kettlewell v. Stewart, 8 Gill, 502.*

In *Haven et al. v. Richardson, 5 New Hamp., 125,* the court concurred in the conclusion of Judge STORY (*4 Mason, 222, 231*), that an assignment containing a stipulation for a release was not fraudulent. Though it seems that afterwards this was prohibited by statute. *Burr. on Ass., 2d ed., p. 162.*

In South Carolina a stipulation for a release is valid. *Niolon v. Douglas et al., 2 Hill Ch., 443; LePrice v. Gulillemot, 1 Rich. Eq., 187.*

In Rhode Island, stipulations in general assignments, as

conditions of preference, have always been allowed. *Angel on Assignments, 112; Burr. on Ass., 2d ed., p. 163.*

So in Vermont, before the act of November 1, 1843, prohibiting general assignments, stipulations for a release, as conditions of preference, were held valid. *Hall v. Denison, 17 Vermont (2 Washburn), 310.*

In *Grover et al. v. Wakeman, 11 Wend., 189,* the cases are reviewed by Mr. Justice SOUTHERLAND, and a stipulation for a release held to avoid the assignment.

The adjudications are also reviewed in *Burrill on Assignments, 2d ed., pp. 156, 178,* and shown to be in conflict.

The cases *pro* and *con* are also collected and cited in a note to *Bump. on Fraudulent Assignments, p. 433,* and he thinks the weight of authority is against the validity of stipulations for release.

There is also a review of the cases in *1 American Leading Cases (Hare & Wallace notes), 71, etc.,* but no expression of opinion as to weight.

In some of the cases cited as against the validity of a deed, with a stipulation for release, the debtor assigned part of his property, and not the whole, and in others, reserved to himself the benefit of any surplus. Others are influenced by statutes prohibiting preference.

It was said in *Miller et al. v. Conklin & Co. et al., 17 Georgia, 431,* that the decisions sustaining the validity of a deed with a stipulation for a release, were made in the earlier days of the republic, when our policy, legal and commercial, had but slightly diverged from that of Great Britain.

None of them, however, are as old as the common law, on which they were based, and which has not ceased to be of value on account of its venerable age. Moreover, some of our greatest lawyers and jurists lived in the earlier days of the republic.

.The authorities are in harmony, that an insolvent or failing debtor may make a valid assignment of all his property to preferred creditors, leaving others, unprovided for, to look to his future labor and acquisitions for the satisfaction of their claims.

This being so, why may he not prefer such as may give a release? Creditors refusing are simply unprovided for.

There being no statute in this state prohibiting it, there is nothing in the general statute against fraudulent conveyances which can be construed to prevent a debtor from assigning all of his property, without reservation of benefit to himself, to a trustee, for the payment of his debts, with a stipulation for a release.

In the language of Chief Justice MARSHALL, both policy and humanity plead strongly in favor of leaving to the unfortunate debtor, who, in good faith, surrenders all his property to his creditors, the benefit of his future labor.

The question is by no means free of doubt, owing to the conflict of judicial opinions, but, after looking over the whole field, and considering the cases *pro* and *con*, we have concluded to affirm the ruling of the court below on this point. A strong feature in favor of the validity of the assignment in this case is, that it was made at the request of, and accepted by all of the creditors, except the two dissenting firms, whose claims were small.

IV. The agreed statement of facts further showed that, after the execution of the deed of assignment, and after the commencement of this suit, the assenting creditors put the assignors into bankruptcy, but that the bankrupt court declined to interfere with the assignment, further than to order the assignee in the deed to account to the assignee in bankruptcy for the proceeds of the sale of the property, etc.

The court refused to declare the law to be that the

28—36

assenting creditors had waived their rights under the assignment by putting the assignees into bankruptcy.

We suppose the bankrupt court will deal with this question.

Upon the facts of the case, appellee was entitled to maintain replevin for the goods as against appellant.

Affirmed.

### SEPARATE OPINION.

EAKIN, J. Upon all the points of the opinion, save as to the act of 1859, I agree with the court. Also, in the result. If the act be valid, I can see nothing in its terms, or its policy, to prevent the deed of assignment from having its legitimate effect to *pass the right* at the time of its execution.

If the legislature had intended to render the deed inoperative until the schedule and bond should be respectively filed and made, it would naturally have used apter language to express the intention; as, for instance, was done in the case of mortgages by the " Revised Statutes." It was declared that mortgages should be a lien from the time of filing in the recorder's office " *and not before.*"

To say that the assignee shall not " take possession, sell, or in any way manage or control" the property, consists well enough with the idea that the title is in him. Indeed, it seems to presuppose it.

No more anomalous condition of things exists, meanwhile, than may at any time be produced by an injunction in chancery, not at all affecting an ultimate decision on the right. The legislature meant to prevent any act by the assignee to jeopardize the fund until creditors could see of what it consisted, and know it to be secure. If the assignee should delay or hesitate in his required duty, the creditors would not be hurt. A chancery court would ap-

Clayton v. Johnson.

point another trustee, or give them a receiver of its own selection.

I am very clear also, that the court is right in holding the deed of assignment good, against the charge of fraud. No time is fixed for the creditors to accept and release. Nevertheless, the deed is not amenable to the objection sometimes made on that account. The whole force of such objection lies in this that the execution of the trust is indefinitely or unreasonably suspended in such cases, and that creditors are meanwhile hindered and delayed, whilst the property is tied up, awaiting their respective elections as to acceptance. This deed evidently contemplates an immediate execution of its provisions without unreasonable delay, and under its terms the trustee ought to proceed at once. It can not be said that the failure to designate a fixed time, in which the creditors must accept is a badge of fraud. When the trustee realizes under the deed it is his duty to pay over to all who *have* accepted—after a reasonable time for notice to all. I do not think the deed in this respect needs the support of the act of 1859, fixing the time in which the trustee must sell.

As to the principal point of discussion, the effect of a stipulation for a release upon the validity of the deed, the only hesitation I could have would arise from the strong intimations here and there given by eminent jurists, on and off the bench, that such stipulations were against the highest moral sense, and oppressive upon the sterner class of creditors. With much real deference for their opinions, I think, however, that their scruples are not well founded. Almost every man, upon reflection, will be conscious of some nicer differences in the moral obligations, between many debts, all having the same binding force at law, and courts both of law and equity, have ever respected that sentiment, and allowed debtors to make voluntary prefer-

ences in payment; provided, only, that the debtor does pay honest debts, reserving no secret advantage to himself, or such as would impede other creditors in the collection of their claims against himself.

The whole force of English authority is to the effect that if a debtor assigns all his property for the payment of debts, he may prefer, in the distribution, that *class*, whose humanity would induce them to let him go forth into the struggles of business unburdened, though empty-handed. All the cases agree that a debtor may prefer *specified* creditors. He may pay A., B. and C., postponing D., E. and F. That is already settled generations back. If it be hard on D., E. and F., they must complain of the dull, moral sense of the legal sages, who are accepted as such, and thought to have laid the foundations of law and equity upon the most solid principles of morality and fair dealing. I think they were right. Many debts *should* be preferred, upon principles easy enough of application by the individual, but too subtle to be defined or enforced by courts.

And if D., E. and F., may be postponed against their will, what harm or fraud can it be in a debtor, to allow them, at their option, to come in with the favored class upon the same terms. Indeed, it is quite apparent, that all objections to deeds of assignment, simply upon the ground that they are for the benefit, in the first instance, of the class willing to release, can not stop short in logical sequence, of denying all right of preference whatever. The objections can not consist with the right.

The conflict of authority is recognized, and has been well presented by the Chief Justice in the opinion of the court. I think the weight of authority, and I am sure the better reason, as well as the instincts of humanity, are with the English line of ruling now adopted. I incline to think that the contrary opinions, where not based upon some substan-

tial element in the deed, indicative of fraud, have grown from the necessity and practice, under insolvent and bankrupt laws, of adopting the maxim that "equality is equity." I think, however, a rule of practice has been mistaken for a maxim of morality, and has brought about some confusion of moral sentiments. It is not true that the moral obligation to pay all debts is the same, for each, although it exists to pay all before the debtor can honestly cease his efforts, or retain his property. Always provided, that the courts be jealous of all indications of actual fraudulent intent, and taking care that the debtor be allowed to make no secret reservations for himself, nor hinder nor delay his creditors as to the balance of his property. I think it eminently proper, and conducive to the public weal, that creditors should be encouraged to lift the burden from the shoulders of honest debtors who willingly and ingenuously give up all, and that debtors should continue to be allowed to prefer them in the distribution of their effects.

But, whilst I concur in the opinion that the assignee had the right to the goods under the assignment, I can not in so much of it as is based on the act of the sixteenth of February, 1859, and holds that it is constitutional, and still in force. The first section of the act requires the assignee to file an inventory of the property "in *the office* of the clerk of the probate court," and to make a bond, to be approved by the *probate judge* of the county. The statute makes no provision for the custody of the bond, after approval, but it may be supposed the intention was that it, also, should be filed in the office of the clerk. This section merely designates the *person* to approve the bond, and the *place* for the custody of the inventory.

A marked change of intention is manifest in the second section. This calls into action the agency of *a court*, as distinct from the persons of the judge and clerk, and from

the location of the office. It provides, that at the first term of the *probate court*, which occurs more than a year after the date of the assignment, and at the corresponding term of each succeeding year, the assignee shall present *to said court* a written statement of his account-current, charging himself with assets assigned, and crediting himself with payments and expenditures; and that he shall *exhibit* with the account, all his receipts and vouchers.

Further, that this account shall then be filed in the office of the clerk of the probate court, and shall "become a part of *the record* thereof;" and that certified copies of the same shall be competent evidence of the facts therein contained as fully as "the records of *any other court.*"

No action of the probate court is expressly required, nor is there any *express* power given to approve or reject the settlement, nor to call the assignee to an account in case of failure.

It might be a question, if the act were otherwise valid, whether or not the court might, by rule, compel the assignee to file the settlement or show cause, but waiving that, and conceding, for the purpose of the argument, that the act imposed on the court no judicial duty, nor discretion, we must still suppose that the legislature meant something by the change alluded to; and was not simply doing a vain and foolish thing, with no fixed purpose. This would be less respectful to it than to suppose it had unwittingly violated the constitution in its zeal to effect a policy. The rational construction of the act is, that the legislature, recognizing its inability to impose upon the probate courts judicial duties, and to confer judicial powers, in regard to the subject matter, had, nevertheless, attempted to make use of these tribunals, or courts, by requiring them to receive these settlements and exhibits, and give them dignity, notoriety and authenticity, by

allowing them to be presented in term time, during their sessions, as a part of the business of the court, and making them parts of the records of the court.   The records of a court are not composed of any loose papers, stuck away in the pigeon-holes of the clerk.   They are registered memorials of its proceedings (*Blackstone, B. 1., p. 69; B. 3, p. 24*), and must, of course, concern its legitimate business. Their existence implies something done in the court, under its supervision, and which it had the power to do.   They could not be certified as records under the seal of the court unless accompanied with an extract from the minutes, showing that the proper person had appeared in court and done the act required.

If the legislature could clothe these limited tribunals with the necessary functions to make them agencies for purposes not contemplated by the constitution, then we have nothing to do with the policy of the act.

When the act was passed the constitution of 1836 was in force.   By it the judicial power of the state was vested in the supreme, circuit, county, and justices courts.   It was not contemplated that there would be any other powers vested in courts than those of a judicial nature.

Power was given to the legislature to establish courts of chancery also, if deemed expedient; and to confer any jurisdiction it might deem necessary in corporation courts. The judge of the county court was empowered to act as the judge of a probate court " and have such jurisdiction in *matters relative to the estates of deceased persons, executors, administrators* and *guardians* as may be prescribed by law, un til otherwise directed by the general assembly."

It is impossible to mistake this provision.   It rigorously restricted the subject-matters proper to come before the probate court, and by unavoidable implication excluded all others.   Even as to those enumerated, the jurisdiction was

at the will of the legislature. There are many indications in this constitution that the probate court was merely provisional, as a branch of the county court. It is not enumerated in the list of courts amongst which the judicial power is divided (*Art. VI, section 1*), and which expressly mentions every other. No superintending control was given over it to the circuit court, save by implication, as a part of the county court. (See section 5.) There is nothing in the constitution of 1836, which by any, the most liberal extension of construction could have empowered the legislature to use the probate courts in the manner attempted by the act of 1859.

The subject matter does not concern the estates of deceased persons, nor administrators, nor executors, nor guardians.. It seems to me that the act was void from the beginning, as in conflict with the constitution, under which it passed.

I understand the court, in the case in judgment, to concede that it would take the same view without any hesitation, if the act had attempted to confer upon the probate court any powers or jurisdiction whatever ; but it does not conceive the act to have that effect, as it carefully refrains from directing any judicial action. I am not able to sustain the act upon that distinction. It is not unquestioned that courts can be empowered, as such, to do any other than judicial acts at all. It is gravely doubted, in many quarters; but if it were conceded with regard to subject-matters within their appropriate ambits, it would not follow that courts of strictly circumscribed fields might be allowed a boundless range of action upon condition of refraining from all things requiring judicial discretion.

But further, the act in terms applied to *probate courts* alone, which were certain well-understood tribunals, provided for in the constitution of 1836, and presided over by

the county judge. They were continued under the constitution of 1864 without change.

The constitution of 1868 preserved only the supreme and circuit courts, as constitutional courts, subjecting all others to legislative change, but preserving them meanwhile. Under this constitution probate courts were entirely abolished by act, sixteenth of April, 1873.

There was no longer left any " probate court" or " clerk of the probate court," or "probate judge " all of whom were specifically designated as the officers and tribunals to execute the act.

The learned and careful compilers of Gantt's Digest, conceiving that the policy of the act ought not to be defeated, and doubtless relying upon legislative sanction for the change, brought forward the act of 1859 in a somewhat new dress, substituting for "court of probate" whenever it occurred, the words, " the court exercising probate jurisdiction." This was only the private judgment of the compilers, as to what the law should be. The law is to stand or fall upon its original terms. The compilers were not authorized to make any substantial change in the laws, and this seems substantial. If the legislature had deemed it important, when abolishing probate courts, to transfer this function, if valid, at all, to the circuit courts and their clerks and judges, it might have done so. If it failed it was a *casus omissus* which the compilers could not cure, by change of phraseology. The law could not survive the probate courts.

What the act of 1873 did do, was to provide for the transfer to the circuit courts of " all matters pertaining to probate, and of administration, in minors' business and allotment of dower, in cases of idiocy and lunacy, and of persons *non compos mentis,* and of everything properly pertaining to matters cognizable in courts of probate; and all

the powers and jurisdiction now possessed by courts of probate." See *Pamph. Acts of 1873, sec. 6, p. 120.*

The matter of receiving, in open court, the settlements and vouchers of assignees, and allowing them to be incorporated with the court records, is not amongst those specified; nor does it pertain to matters cognizable in courts of probate.

I understand the opinion of my associates, sustaining the constitutionality of the law, to be based upon the view that the act of 1859 was not intended to give the probate courts *cognizance* of the matter in any way—certainly not to give them any *powers* or *jurisdiction.* It is conceded that if such had been its intended effect, it would have been in violation of the constitution then in force. If their view be correct, there is nothing in the terms of the act of 1873 to authorize the *circuit* clerk, judge or court, to do acts not of a judicial character, which the former statute had expressly directed to be done by other officers and courts.

If, on the other hand, as I think, the object of the act of 1859 had been to give the probate courts cognizance of the subject-matter, with some powers and jurisdiction, then it was void *ab initio.* In either view, the act of 1859 became a dead thing after the act of 1873. The constitution of 1874 continued all laws then in force, not in conflict, or inconsistent with its provisions, but did not *operate* to resurrect any that were dead. (*Schedule, Const. of 1874, sec. 1*). But if it had been still alive, it seems to me so inconsistent with the lines and boundaries of jurisdiction prescribed to the courts by the present constitution, that it could not have passed, unchallenged, through the gate of the schedule.

A distinguishing characteristic of the present constitution is seen in the care taken to define and prescribe the functions of the courts. Five classes of courts are estab-

lished—the supreme, circuit, county, probate and justices' courts. The business and powers of all, except the circuit courts, are carefully prescribed, in such manner as to exclude all extension by construction. To cover all omissions, and provide for any unforeseen exigencies, general original jurisdiction was given the circuit courts "in all civil and criminal cases, the exclusive jurisdiction of which may not be vested in some other courts provided for by this constitution." (*Art. VII, sec. 11*). Permission was given to establish some particular statutory courts, which need not be noticed. Thus the circuit courts were made the great reservoirs of all original business whatever which might be properly done by courts, with the exception of that which, by the constitution itself, had been directed into well-marked channels.

The business of the probate courts was bounded with particular rigidity. Section 34 of Article VII is as follows: " The judge of the county court shall be the judge of the court of probate, and have such exclusive original jurisdiction in matters relative to the probate of wills, the estates of deceased persons, executors, administrators, guardians and persons of unsound mind, and their estates, as is now vested in the circuit court, or may hereafter be prescribed by law." Thus the constitution recreated the probate courts, and threw back to them, in very measured terms, all the jurisdiction which it was supposed had been taken by the circuit courts, when the probate courts were abolished in 1873. If the framers of the constitution had considered the act of 1859 still in force, and proper for the probate courts, they doubtless would have restored this business to them, as expressly as they did all other. By no stretch of construction can the jurisdiction of probate courts be now extended beyond the very subject-matters specified. There is no general claim to embrace subject-matters of a kindred

nature. Their powers are in a cast-iron vessel. The limits are inflexible so far as the subject-matters are concerned, and this matter now before us, in which it is thought the probate courts should afford their passive agency, is not one of the subject-matters.

I can not concede that any courts, for whatever purpose established, or however restricted by the constitution, may be empowered to do any and all sorts of ministerial acts for the public convenience. The border-land between judicial and ministerial acts, is often very misty, and jurisdictions would soon become confused. Besides, courts and officers of courts might be overwhelmed with business foreign to the purposes of their creation.

All ministerial acts of *courts* as distinct from individuals, should be ancillary only to their legitimate jurisdiction. If it should at last be found necessary to use courts merely for the public convenience, as ministerial tribunals, against which I protest, but which I will not now discuss, the circuit court is the only proper tribunal for the purpose of general matters.

Especially if courts are to take the place of recorders' offices, I would think the circuit court, as having most suitors, the most appropriate to have one seen during its session to walk in with a settlement and vouchers in his hand, exposed to the view of the judge, who can not see them judicially, but who sits mute until the clerk files them so as to become a part of the record. I can not understand the court, by its opinion, to give the act any other effect than this. To say the least, it is business of a very anomalous nature.

Another anomaly grew, for awhile, out of this attempt to jumble ministerial and judicial functions, if we do not consider it a well-meant fiasco from the beginning. If the act were in force, there was a time between the act of 1873

and the constitution of 1874, when the circuit court, the highest court of original general jurisdiction, was compelled to receive the settlement of assignees, and their exhibits of vouchers, and admit them to its records, without any jurisdiction to approve, reject or alter; or to make any order for distribution of balances. No person could take any advantage of it whatever. It merely made evidence *de bene esse*, as it were. To use it at all, there must have been a new and distinct suit by any one having interests in the trust. This, to my mind, is very persuasive against any intention of the legislature to keep the act of 1859 in force after the destruction of the probate courts.

From respect to a co-ordinate branch of the government, and out of deference to the carefully-matured opinions of my associates, I would have let the opinion pass, without public dissent, but that I apprehended hereafter incalculable evils and confusion to arise, not from this act, but from the precedent of disregarding the constitutional limitations on the business of the courts, under the guise of making their acts ministerial only. It should not fade from view, that in all systems of judicature, courts are for judicial purposes only, and should never do any other business, save such as may be either of a judicial nature, or ancillary to their proper jurisdiction. I think the act of 1859 was void in its inception. If not, I think it perished with the probate courts. If not, I think it inconsistent with the constitution of 1874.

The constitutional objection applies to the second section. The first, if enacted alone, might stand, but it was not so intended. Evidently it was only preliminary to the second, and both together were intended to make a system, to prompt a more rapid and faithful administration of trusts by trustees. The act can not be divided. *Non constat* that

the legislature would have passed it unqualified by the second section.

I apprehend no mischiefs from holding the act unconstitutional, and, therefore, have less hesitation in dissenting. Without the act, deeds of assignment, to have any effect against creditors, must be recorded; and courts of chancery will always at once interfere, without even waiting a year or more, to coerce settlements or protect the property.